· Elaine Brum, administratrix,[1] vs. Town of Dartmouth
& others.[2]
Frances B. King, administratrix,[3] vs. Commonwealth
& another.[4]

Bristol. Suffolk. November 2 & 6, 1998. - January 21, 1999.

Present: Wilkins, C.J., Abrams, Lynch, Greaney, Fried, Marshall, & Ireland, JJ.[5]

*Massachusetts Tort Claims Act. Governmental Immunity. Civil Rights,* Avail-
ability of remedy, Immunity of public official. *Practice, Civil,* Interlocutory
appeal, Motion to dismiss. *District Attorney. Bail. Negligence,* Governmen-
tal immunity, Public employee, School. *School and School Committee,* Li-
ability for tort. *Statute,* Construction. *Due Process of Law,* Substantive
rights.

An assistant district attorney's recommendation to a judge that a criminal
    defendant be released on personal recognizance, even if shown to be
    negligent conduct, was too remote to be a causative factor, as a matter of
    law, of the defendant's subsequent murder of a police officer after his
    release on personal recognizance by a judge, and the Commonwealth and
    the district attorney's office could not be held liable under the Mas-
    sachusetts Tort Claims Act, G. L. c. 258. [688-689]
Discussion of the so-called statutory public duty rule set forth in G. L. c. 258,
    § 10 (j). [692-695]
This court construed the so-called statutory public duty rule set forth in G. L.
    c. 258, § 10 (j), to preclude public employer liability for failures to dimin-
    ish or prevent harm, including harm brought about by the wrongful act of
    a third party; accordingly, public school officials were not liable under the
    Massachusetts Tort Claims Act for their alleged negligent failure to protect
    a certain student from a known threat that resulted in his murder on school
    premises by third parties. [691-692, 695-696] Ireland, J., with whom
    Abrams & Marshall, JJ., joined, concurring.
A sixteen year old high school student, not subject to the compulsion of G. L.
    c. 76, § 1, to attend school, was not in a custodial or other special relation-
    ship with the school creating a due process right under the Fourteenth

---

[1]Of the estate of her son, Jason Robinson, and individually.
[2]The selectmen of Dartmouth, the school committee of Dartmouth, the
superintendent of Dartmouth schools, and the principal of Dartmouth high
school.
[3]Of the estate of Berisford Wayne Anderson.
[4]District attorney of the Northern District.
[5]Justice Abrams was not a member of the panel hearing the case of King
*vs.* Commonwealth.

Amendment to the United States Constitution such as would render school officials liable under 42 U.S.C. § 1983 for their failure to protect the student, while at school, from harm caused by third parties who were not school officials or their agents [697-704]; and that the harm was foreseeable and that school officials had a duty under G. L. c. 71, § 37H, to adopt security policies did not create any liability under § 1983 [704-705]; further, the "State-created danger" doctrine was not applicable to create liability, where school officials were not alleged to have committed any affirmative act placing the student in danger [705-707].

A claim brought under the Massachusetts Civil Rights Act, G. L. c. 12, § 11I, that did not allege the requisite threats, intimidation, or coercion was correctly dismissed by a judge of the Superior Court. [707-708]

CIVIL ACTION commenced in the Superior Court Department on November 4, 1994.

The case was heard by *John M. Xifaras*, J., on a motion to dismiss.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

CIVIL ACTION commenced in the Superior Court Department on February 3, 1997.

The case was heard by *Patrick J. King*, J., on a motion to dismiss.

The Supreme Judicial Court granted a request for direct appellate review.

*John J. Davis* for town of Dartmouth & others.

*James E. Riley, Jr.*, for Elaine Brum.

*William J. Meade*, Assistant Attorney General (*Crispin Birnbaum*, Assistant Attorney General, with him) for the Commonwealth & another.

*Steven D. Frank* (*Paul K. Flavin* with him) for Frances B. King.

The following submitted briefs for amici curiae:

*Thomas J. Urbelis & Robert T. Ford* for Massachusetts City Solicitors and Town Counsel Association.

*Michael J. Long* for Massachusetts Association of School Superintendents.

*Leonard H. Kesten & Kurt B. Fliegauf* for Massachusetts Municipal Association.

FRIED, J. These cases raise issues under G. L. c. 258, § 10 (*b*) and (*j*), immunity provisions of the Massachusetts Tort Claims Act. The defendants in *Brum* v. *Dartmouth*, 44 Mass. App. Ct. 318 (1998), sought further appellate review after the decision of the Appeals Court overturned the Superior Court judge's order granting the defendants' motion to dismiss. *King* vs. *Commonwealth* is before this court on direct appellate review of the Superior Court judge's denial of the defendants' motion to dismiss. The public employers in both cases are not liable as a matter of law.

I

King vs. Commonwealth.

In November, 1993, a judge released Dalton O. Simpson, who had been in custody on various criminal charges, on personal recognizance in response to an agreement between Simpson and the district attorney's office. Almost three months later, in February, 1994, Simpson shot and killed Boston police officer Berisford Wayne Anderson. Frances B. King, administratrix of Anderson's estate, filed suit against the Commonwealth and the district attorney's office,[6] seeking actual and punitive damages under the Massachusetts Tort Claims Act, G. L. c. 258, claiming that Anderson's conscious suffering and wrongful death were the result of an assistant district attorney's gross negligence in agreeing to Simpson's release and the district attorney's negligent supervision of the assistant district attorney. The Commonwealth and the district attorney's office moved to dismiss on the ground that they were shielded from suit by G. L. c. 258, § 10 (*b*) and (*j*), which provide immunity from Torts Claims Act actions in certain circumstances. That motion was denied by a Superior Court judge in August, 1997.

Brum vs. Dartmouth.

Jason Robinson, son of the plaintiff Elaine Brum, was stabbed to death at Dartmouth high school in April, 1993, by three armed individuals, at least one of whom was not a student at the school. Earlier that morning, the three assailants had been involved in a violent interaction at the school with two of Rob-

---

[6]King also sued Simpson, making separate allegations against him. Simpson is not a party to the motion or appeal.

inson's classmates and possibly with Robinson as well, but had left the school immediately afterward. After the altercation, the school principal detained Robinson's two classmates, but not Robinson, and one of the classmates informed the principal that the three individuals who had fled planned to return to the school and retaliate against him and his friends, including Robinson. Later that morning, the assailants, visibly armed, did return to the school and proceeded to a second floor classroom, unimpeded by school officials, where one of them stabbed Robinson to death.[7] Brum brought suit against the town of Dartmouth and several town and school officials under the Massachusetts Tort Claims Act, the Massachusetts Civil Rights Act, and 42 U.S.C. § 1983 (1994), alleging that the defendants' negligent failure to maintain adequate security measures at the school and specific failure to protect her son in the presence of a known threat resulted in Robinson's death and violated his rights under the Fourteenth Amendment to the United States Constitution. The Superior Court's order granting the defendants' motion to dismiss based on the immunity provisions of § 10 (*j*) was subsequently overturned by the Appeals Court. See *Brum* v. *Dartmouth, supra.*

## II

Interlocutory rulings, such as the Superior Court's order denying the motion to dismiss in *King*, generally are not appealable until the ultimate disposition of the case because they are not "final orders." See *Kargman* v. *Superior Court*, 371 Mass. 324, 329-330 (1976). In a limited class of cases, however, such an order is immediately appealable if it concerns an issue that is "collateral to the basic controversy," *Maddocks* v. *Ricker*, 403 Mass. 592, 600 (1988), and if "any later appeal would be futile" were the order to be presently executed. *Breault* v. *Chairman of the Bd. of Fire Comm'rs of Springfield*, 401 Mass. 26, 30 (1987), cert. denied sub nom. *Forastiere* v. *Breault*, 485 U.S. 906 (1988). See *Borman* v. *Borman*, 378 Mass. 775, 780 (1979), quoting *Vincent* v. *Plecker*, 319 Mass. 560, 564 n.2 (1946). Thus, "if an appeal from [final disposition of the case] would not be likely to protect the [party's] interests," the order is appealable. *Maddocks, supra.*

[7]The individual who stabbed Robinson was subsequently convicted of murder in the second degree. See *Commonwealth* v. *Reed*, 427 Mass. 100 (1998).

In *Breault* v. *Chairman of the Bd. of Fire Comm'rs of Springfield, supra* at 31, which dealt with an immunity defense under 42 U.S.C. § 1983, this court distinguished between immunity from liability and immunity from suit, holding that only orders denying immunity from suit enjoy the benefit of the present execution rule. See *Hopper* v. *Callahan*, 408 Mass. 621, 624 (1990) (interlocutory appeal of denial of summary judgment motion asserting immunity); *Matthews* v. *Rakiey*, 38 Mass. App. Ct. 490, 493 (1995). The right to immunity from suit would be "lost forever" if an order denying it were not appealable until the close of litigation, and, thus, such an order meets the criteria of the rule of present execution. *Id.*

The Commonwealth's motion to dismiss in *King* was based on a claim of immunity under G. L. c. 258, § 10, which sets out several exceptions to the Massachusetts Tort Claims Act. An order denying such a motion is a "final order" meeting the criteria described above, and is immediately appealable. Section 10 of the Act confers immunity from suit, see *Spring* v. *Geriatric Auth. of Holyoke*, 394 Mass. 274, 285 (1985), a right that is "lost as litigation proceeds past motion practice," *Puerto Rico Aqueduct & Sewer Auth.* v. *Metcalf & Eddy, Inc.*, 506 U.S. 139, 145 (1993). This court has noted the importance of "determining immunity issues early if immunity is to serve one of its primary purposes: to protect public officials from harassing litigation." *Duarte* v. *Healy*, 405 Mass. 43, 44 n.2 (1989). As the Supreme Court stated in *Mitchell* v. *Forsyth*, 472 U.S. 511, 525 (1985), with respect to suits against immunized officials, "even such pretrial matters as discovery are to be avoided if possible, as '[i]nquiries of this kind can be peculiarly disruptive of effective government.' " *Id.* at 526, quoting *Harlow* v. *Fitzgerald*, 457 U.S. 800, 817 (1982). In light of the desirability of resolving immunity issues quickly, it is preferable to dispose of the question before discovery, as on a motion to dismiss. See *Caron* v. *Silvia*, 32 Mass. App. Ct. 271, 273 (1992). We do not in fact reach this immunity issue in King *vs.* Commonwealth, because we conclude the Commonwealth's motion to dismiss on other grounds should have been granted. This does not, however, deprive us of jurisdiction.

## III

King claims that the Commonwealth and the Middlesex district attorney's office are liable under the Massachusetts Tort

Claims Act, G. L. c. 258 (Act), for the wrongful death of Anderson because his death was proximately caused by the defendants' grossly negligent release of Simpson from custody. Regardless of whether the defendants acted negligently, they are not liable under the Act for Anderson's death because they were not ultimately responsible for Simpson's release.

King asserts that the defendants "allowed" Simpson to be released from custody on personal recognizance. A prosecutor, however, does not have the authority to allow or disallow the release of a prisoner. Although the prosecutor may make a recommendation concerning bail, only a judge, clerk, bail commissioner, or master in chancery has the authority to set bail or release an individual on personal recognizance. See G. L. c. 276, §§ 57, 58. Even assuming that the prosecutor had recommended that Simpson be released on personal recognizance, and even if a judicial officer may be more likely to release a prisoner on personal recognizance where the prosecutor recommends this course of action, the fact remains that the power to release the individual is ultimately in the hands of the judicial officer, not the prosecutor. At most, King may have been able to show that, but for the prosecutor's recommendation, the judge would not have released Simpson on his own recognizance and that Simpson would have been unable to meet any bail requirements placed on him and so would have remained in custody. Such a chain of causation is too long and contains too many speculative links to connect the assistant district attorney's action to the violence that ultimately befell Anderson.[8] Any effect the assistant district attorney's actions may have had in effectuating Simpson's release and subsequent killing of Officer Anderson is simply too remote to serve as a source of liability under the Act.

## IV

The defendants in both of these cases argue that the plaintiffs' claims are barred by the immunities set out in G. L. c. 258, § 10 (*b*) and 10 (*j*). Because we have concluded in King *vs.* Commonwealth that, as a matter of law, the defendants' actions were not a proximate cause of Simpson's release, and, thus, that

---

[8]We note that at the time Simpson was released, future dangerousness, the very consideration King urges here, could not permissibly be taken into account in determining whether and under what conditions Simpson should be released. See *Aime* v. *Commonwealth*, 414 Mass. 667 (1993).

King's claims should have been dismissed, we need not decide the applicability of § 10 immunities in that case.

## A

In Brum *vs.* Dartmouth, the defendant town of Dartmouth invokes § 10 (*b*), asserting that deciding what security measures to implement at a public school is an act involving discretion on a matter of policy or planning. The essence of Brum's claim, however, is not that the school officials abused their discretion by implementing faulty security measures, but that the school had no security measures at all, in violation of G. L. c. 71, § 37H, which requires each school district to implement and publish school policies including "standards and procedures to assure school building security and safety of students and school personnel."[9] Discretionary function immunity does not apply in cases in which a government official's actions were mandated by statute or regulation. See *Dobos* v. *Driscoll*, 404 Mass. 634, 652, cert. denied sub nom. *Kehoe* v. *Dobos*, 493 U.S. 850 (1989). Section 37H clearly mandates the adoption of some measures, and, therefore, school officials have no discretion in that matter. Thus, if the school in fact had failed to adopt any security measures at all, claims based on this failure would not be barred by § 10 (*b*).

---

[9]Counsel for the town stated at oral argument that he recently had discovered that the relevant language in G. L. c. 71, § 37H — mandating adoption of security measures by school committees — was added to the statute in an amendment taking effect in June, 1993 (St. 1993, c. 71, § 36), and, therefore, was not in effect at the time of Robinson's death in April, 1993. Were that true, the discretionary function would clearly apply, and the plaintiff's claim would be disposed of easily.

As Brum's counsel pointed out in a postargument letter to this court, however, the language of § 37H has, since 1987, stated that: "[e]ach school committee's rules or regulations pertaining to the conduct of students shall include the following: . . . procedures to assure school building security and safety of students and school personnel . . . ." The use of the word "shall" makes adoption of security measures mandatory, and the 1993 amendments, which in no way changed this provision, are irrelevant to this issue.

Counsel for the town quoted, as support for its argument, G. L. c. 71, § 37, which is entirely separate from § 37H, and which, before June, 1993, contained the word "may" with reference to school committees' adoption of policies regarding the length of the school week and year. It was rewritten in 1993 to use the word "shall." St. 1993, c. 71, § 35. It is not apparent how that provision is in any way relevant to whether schools are compelled to adopt security policies. Therefore, the fact that its language was changed from "may" to "shall" is irrelevant.

The pleadings establish that a "No Trespassing" sign and a sign asking all visitors to sign in at the school office were posted at the school. The parties disagree about whether these signs amount to "standards and procedures" under § 37H. Because Brum's suit is barred by § 10 (*j*), however, see *infra*, we decline to decide whether, in the circumstances of this school at this time, these signs amounted to a security policy and, consequently, do not decide whether the town's alleged failure to adopt a school security policy would be actionable despite § 10 (*b*).

## B

Defendants in both Brum *vs.* Dartmouth and King *vs.* Commonwealth argue that the plaintiffs' claims against them are barred by the so-called statutory public duty rule of G. L. c. 258, § 10 (*j*), which exempts from the Tort Claims Act "any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer."

As indicated above, we need not consider this claim as it applies in King *vs.* Commonwealth. The plaintiff in Brum *vs.* Dartmouth argues that § 10 (*j*) does not bar her claim because the condition that led to her son's death was the lack of security on the school premises, which was originally caused by the defendants' failure to adopt security policies as they were required to do by G. L. c. 71, § 37H. The Appeals Court agreed, reasoning that, by failing to implement a security policy at the school, the defendants created the "initial injury-causing condition of physical insecurity," and subsequently, by failing to apprehend the perpetrators on the day of the murder, they "exacerbated the hazardous condition" they had created, "thereby materially contributing to the circumstances that directly led to the tortious injury. Those scenarios constitute risk-creating conduct on the part of public employees that is sufficient to overcome the bar of § 10 (*j*)." *Brum* v. *Dartmouth*, 44 Mass. App. Ct. 318, 326 (1998).

Thus, the plaintiffs argue that § 10 (*j*) does not confer immunity on the defendants because the defendants "originally caused" the dangerous "condition or situation" that resulted in the killings by the "violent . . . conduct of a third person." But

it is also true that those killings came about because the defendants "failed to prevent" them. We are thus forced to construe the first sentence of § 10 (*j*) to give meaning both to what appears to be its announced principal purpose, which is to confer immunity on public employees for harm that comes about as a result of their "failure . . . to prevent" the "violent or tortious conduct of a third person," and to do so in the presence of the clause which removes that immunity where the "harmful consequences" were "originally caused by the public employer."

To say that § 10 (*j*) presents an interpretive quagmire would be an understatement. The language is convoluted and ambiguous, as evidenced by the difficulty Superior Court judges have had in applying it and the inconsistency of outcomes. The particular issue in question in these cases, the meaning of the "originally caused" clause in § 10 (*j*), has not to date been directly addressed by this court.

The principal purpose of the provision, as we have said, must be taken to be announced in its opening clause: to exclude liability for "an act or failure to act to prevent or diminish" certain "harmful consequences." Which harmful consequences? All those "including the violent or tortious conduct of a third person." The "including" clause must modify the noun "consequences," rather than the nearer nouns "condition" or "situation," because conduct cannot grammatically or logically constitute "a condition or situation." Thus, there is immunity in respect to all consequences except where "the condition or situation" was "originally caused by the public employer." We take the "originally caused" clause to modify "condition or situation," although it might also be read to qualify only the nearer term "conduct of a third person." If the latter interpretation were adopted, the exception to the exclusion would apply only if the public employer had caused the third party's wrongful act and not in the broader circumstance, if it caused the "condition or situation" leading to "harmful consequences" generally.

The plaintiff's contention is that the neglect of duty by the school officials in Brum *vs.* Dartmouth "originally caused" the "condition[s] or situation[s]" of which either the killers' acts or the death of their victim were "the harmful consequences." But if a neglect of duty can be taken to "originally cause[]" such a "situation," then the opening words of § 10 (*j*), immunizing "act[s] or failure[s] to act to prevent," which we take to an-

nounce the provision's principal purpose, would be virtually read out of the provision. What plaintiff describes as the defendants' neglect of duty just *was* "a failure to act to prevent or diminish." And that is the burden of Justice Kass's pithy dissent in *Brum*: "The school authorities might have *prevented* the killing but failing to prevent, under the statute, is in the excluded category" (emphasis in original). *Brum, supra* at 329 (Kass, J., dissenting). Indeed, on the plaintiff's and the Appeals Court's interpretation, practically every "failure to prevent" might be recast in this way as "originally caus[ing]" a condition, the "harmful consequences" of which are the wrongful "conduct of a third person" and the ensuing harm to the plaintiff, and the exception would swallow the rule.

We acknowledge that, if the principal clause is not qualified out of existence in the way that the Appeals Court and the plaintiff's interpretation would do, we are hard put to discover what the range of application of the subordinate exception to the exclusion — "originally caused" "harmful consequences" — might be. What is needed is an example of a condition leading to a harmful consequence, where that condition was originally caused by the public employer but not brought about by the public employer's failure to prevent it. Many frequently recurring situations are the subject of specific provisions elsewhere in § 10. See, e.g., § 10 (*f*) (claim based on failure to inspect); § 10 (*i*) (claim based on release of prisoner); § 10 (*j*) (3) (claim based on negligent maintenance of public property). Some of these specific provisions require exclusion of liability, some withdraw the exclusion, and some — § 10 (*i*), for example — do both. As they point in all directions, it is best not to look to these specific provisions to elucidate the obscure and convoluted meaning of § 10 (*j*), but rather to allow them to stand on their own bottoms, applying them directly where appropriate.

The history of the provision and subsequent decisions of this court provide some confirmation of our conclusion to apply § 10 (*j*) to exclude liability here. Justice O'Connor's concurrence in *Cyran* v. *Ware*, 413 Mass. 452, 467 (1992), which preceded enactment of the statute, uses the words "originally caused" and is a likely source for the language used in the statute. That case dealt with the common-law "public duty rule," which provided, as a general rule, that "no liability attaches for failure to use due care in carrying out general

governmental functions . . . because the duty of due care is owed to the general public and not to any specific individual." *Cyran, supra* at 455, quoting *Dinsky* v. *Framingham,* 386 Mass. 801, 807 (1982). The concurring opinion would have applied that rule to bar government tort liability where "a plaintiff has been harmed by a condition or situation which was not originally caused by the public employee, and is attributable to the employee only in the sense that the employee failed to prevent or mitigate it." *Cyran, supra* at 467 (O'Connor, J., concurring). And that is what we have identified, from the text itself, as the most eligible principal thrust of the provision.

The circumstances surrounding the enactment of § 10 (*j*) also provide some insight into the meaning of the section.[10] Subsections (*d*) through (*j*) of § 10 were added to the Tort Claims Act by St. 1993, c. 495, § 57, effective January, 1994. That amendment was passed shortly after this court in *Jean W.* v. *Commonwealth,* 414 Mass. 496, 499 (1993), announced its intention to do away with the common-law public duty rule at the next available opportunity after the close of the 1993 legislative ses-

---

[10]The plaintiffs as well as the Appeals Court and several decisions by Superior Court judges have cited Glannon, Liability for "Public Duties" Under the Tort Claims Act: The Legislature Reconsiders the Public Duty Rule, 79 Mass. L. Rev. 17 (1994), as a source of clarification of the meaning of § 10 (*j*). See, e.g., Enterprise Rent A Car of Boston, Inc. *vs.* Imbrogna, No. Civ. A. 94-2000 (Norfolk Superior Court July 2, 1996); McConnell *vs.* Dooling, No. Civ. A. 94-1503 (Norfolk Superior Court June 7, 1995); Hardy *vs.* Somerville, No. Civ. A. 94-2979 (Middlesex Superior Court Dec. 15, 1994). That article, of course, is not part of the legislative history of the statute — not even part of what is sometimes oxymoronically called subsequent legislative history — and should not be treated as such, notwithstanding the fact that Professor Glannon "participated in the committee discussions which led to" § 10 (*j*). Glannon, *supra* at 17 n.*. In fact, the article, although its description of the statute is useful in a number of respects, perpetuates some of the confusion caused by the statute. It argues, for example, that § 10 (*j*) would not bar a suit brought by the parents of a child injured on the schoolyard by another child where the injury occurred under the negligent supervision of a government-employed teacher, but fails to provide any adequate explanation of how such a situation differs from other scenarios — such as one he mentions in which a child is bitten by a rabid raccoon after the public health director had been notified of the raccoon's presence and negligently delayed in responding until after the child had been bitten — which, Glannon argues, may not be the basis of a Tort Claims Act suit due to § 10 (*j*). It will not do (and Glannon does not suggest that it should) to account for the difference by noting that the child's act but not the raccoon's bite is "the violent . . . conduct of a third person," because by its terms such an act of a third person is included in the circumstances giving rise to immunity.

sion because that rule appeared to be inconsistent with the Tort Claims Act and had proved impossible to apply in a consistent fashion. Since § 10 (j) was enacted, this court has noted that it is, in effect, a "statutory public duty rule providing governmental immunity." *Carleton* v. *Framingham*, 418 Mass. 623, 627 (1994). It is clear, therefore, that § 10 (j) was intended to provide some substantial measure of immunity from tort liability to government employers. In light of this, we must not adopt an interpretation of the statute that construes the words "originally caused" so broadly as to encompass the remotest causation and preclude immunity in nearly all circumstances.

The construction of the statute adopted here is consistent with the few opinions of this court that have decided cases under § 10 (j), although none of those cases has defined original causation. In *Bonnie W.* v. *Commonwealth*, 419 Mass. 122, 125 (1994), the plaintiff, who had been sexually assaulted by a probationer employed as a maintenance worker in the trailer park where she lived, brought suit under the Tort Claims Act, alleging that, by recommending her assailant for employment at the park and by failing to supervise him properly under the parole board rules, his parole officer had been responsible for her injuries. Without discussing the meaning of the words "originally caused," this court decided that § 10 (j) barred her claim regarding the parole officer's negligent failure to supervise, but did not bar her claim alleging the officer's negligence in recommending the assailant for employment at the trailer park. The officer's failure to supervise, barred by § 10 (j), can be characterized only as failure to prevent the assailant from being in a position to attack the plaintiff, whereas the negligent recommendation was an affirmative act on the part of the officer that created a situation in which a sexual predator held a job giving him access to the keys to every trailer in the park. This distinction is consistent with our decision in this case. In *Lawrence* v. *Cambridge*, 422 Mass. 406, 409 (1996), the plaintiff's suit was not barred by § 10 (j) because it fell within one of the specific statutory exceptionsto § 10 (j),[11] but this court noted in dicta that, if the exception had not applied, § 10 (j) would have immunized the government

---

[11]Section 10 (j) provides that its exception to liability "shall not apply to: (1) any claim based upon explicit and specific assurances of safety or assistance, beyond general representations that investigation or assistance will be or has been undertaken, made to the direct victim or a member of his fam-

defendants. In that case, after being robbed outside the store where he worked, the plaintiff agreed to testify before a grand jury. The police promised to protect him when he closed the store each night and did so for three nights, but, on the fourth night, no police officer was outside when the plaintiff closed the store, and an armed assailant shot him in the face. See *id.* at 407. The plaintiff's claim that the police negligently failed to prevent his injuries is similar to Brum's claim in the instant case that the school failed to protect Robinson from his attackers. In *Lawrence*, the police could not be taken to have originally caused the criminal conduct of the individual who shot the plaintiff, just as here the school had not originally caused the actions of the persons who killed Robinson. As the plaintiff's claim in *Lawrence* would have been barred by § 10 (*j*) if the exception for "claim[s] based upon explicit and specific assurances," G. L. c. 258, § 10 (*j*) (1), had not applied, the plaintiff's claim in this case is barred by § 10 (*j*).

In sum, the principal purpose of § 10 (*j*) is to preclude liability for failures to prevent or diminish harm, including harm brought about by the wrongful act of a third party. And to interpret, as the Appeals Court did, the subordinate clause referring to "originally caused" conditions, to include conditions that are, in effect, failures to prevent harm, would undermine that principal purpose. Accordingly, we conclude that, in Brum *vs*. Dartmouth, § 10 (*j*) excludes the defendants' liability for their failure to prevent the killing. King *vs*. Commonwealth presents an easier case because the killing in that case was so far removed from the prosecutor's misfeasance, if misfeasance it was, that it cannot even be taken to be a proximate cause or "failure to prevent" it at all. Because the defendants' liability in that case is excluded on other grounds, we need not resolve the issue of the application of § 10 (*j*) to them.

C

The plaintiff in King *vs*. Commonwealth claims that § 10 (*i*)

---

ily or household by a public employee, provided that the injury resulted in part from reliance on those assurances. A permit, certificate or report of findings of an investigation or inspection shall not constitute such assurances of safety or assistance; and (2) any claim based upon the intervention of a public employee which causes injury to the victim or places the victim in a worse position than he was in before the intervention; and (3) any claim based on negligent maintenance of public property; (4) any claim by or on behalf of a patient for negligent medical or other therapeutic treatment received by the patient from a public employee."

establishes that where a plaintiff can make out a claim that a government actor has acted with gross negligence in releasing an individual, the other immunities provided by § 10 cannot operate to bar that claim. Section 10 (*i*) excepts from the Tort Claims Act any "claim based upon the release, parole, furlough or escape of any person . . . from the custody of a public employee . . . unless gross negligence is shown in allowing such release, parole, furlough or escape." The plaintiff argues that § 10 (*i*) creates a cause of action for gross negligence and that, if the immunities provided by § 10 (*b*) and (*j*) were applied to bar claims under § 10 (*i*), the cause of action created by § 10 (*i*) would be effectively read out of the statute.

This argument is meritless. Section 10 (*i*) creates no cause of action for gross negligence. Subsection (i), like the other subsections of § 10, creates an immunity from suit; the provision regarding cases of gross negligence is an exception to that immunity. Thus, a claim alleging gross negligence in releasing an individual may be brought invoking the exception to § 10 (*i*) only if no other immunity under § 10 bars the claim. The immunities provided by § 10 operate in the alternative; even if one immunity contains an exception that would permit a claim to be brought, that claim is barred if any of the other immunities apply. Whether or not King's claim would be barred by either § 10 (*b*) or § 10 (*j*), we need not consider whether the plaintiff's claim could survive § 10 (*i*), because we conclude that the prosecutor's conduct cannot, as a matter of law, be considered a proximate cause of the plaintiff's harm. Accordingly, we need not address whether the plaintiff adequately stated a claim for gross negligence.

### V

### A

Brum asserts a claim under 42 U.S.C. § 1983, alleging that, by failing to protect her son from harm while in school, the defendants violated his right to due process under the Fourteenth Amendment to the United States Constitution. Not all torts recognized by State law give rise to liability under § 1983. See *Daniels* v. *Williams*, 474 U.S. 327, 332 (1986), quoting *Paul* v. *Davis*, 424 U.S. 693, 701 (1976) (Fourteenth Amendment not a "font of tort law to be superimposed upon whatever systems may already be administered by the States"); *Martinez* v.

*California,* 444 U.S. 277, 285 (1980) ("not every injury in which a state official has played some part is actionable" under § 1983). To state a cause of action under that statute, a plaintiff must allege the deprivation of a Federal constitutional or statutory right; § 1983 itself creates no substantive rights. See *Martinez, supra* at 283; *Leffall* v. *Dallas Indep. Sch. Dist.,* 28 F.3d 521, 525 (5th Cir. 1994); *Maldonado* v. *Josey,* 975 F.2d 727, 729 (10th Cir. 1992), cert. denied, 507 U.S. 914 (1993); *Cornelius* v. *Highland Lake,* 880 F.2d 348, 352 (11th Cir. 1989), cert. denied, 494 U.S. 1066 (1990); *Estate of Gilmore* v. *Buckley,* 787 F.2d 714, 719 (1st Cir.), cert. denied, 479 U.S. 882 (1986); *Jackson* v. *Byrne,* 738 F.2d 1443, 1445 (7th Cir. 1984), citing *Baker* v. *McCollan,* 443 U.S. 137, 146-147 (1979). Therefore, our first inquiry must be whether Robinson enjoyed any due process right to be protected by school officials from whatever harm he might encounter while attending school.

The due process clause, generally, operates as a restriction against "unwarranted government interference" but does not guarantee citizens protection from dangers posed by nongovernmental sources. *DeShaney* v. *Winnebago County Dep't of Social Servs.,* 489 U.S. 189, 196-197 (1989), quoting *Harris* v. *McRae,* 448 U.S. 297, 317-318 (1980). The due process clause is not an "affirmative charter of governmental duties" and does not guarantee "certain minimal levels of safety and security" in private life. *J.O.* v. *Alton Community Unit Sch. Dist. 11,* 909 F.2d 267, 272 (7th Cir. 1990), quoting *DeShaney, supra.* See *Jackson* v. *Joliet,* 715 F.2d 1200, 1203 (7th Cir. 1983), cert. denied, 465 U.S. 1049 (1984). Therefore, as the Supreme Court explicitly concluded in *DeShaney* v. *Winnebago County Dep't of Social Servs., supra* at 196-197, a "State's failure to protect an individual against private violence simply does not constitute a violation of the Due Process Clause." See *D.R.* v. *Middle Bucks Area Vocational Tech. Sch.,* 972 F.2d 1364, 1369 (3d Cir. 1992), cert. denied, 506 U.S. 1079 (1993); *L.W.* v. *Grubbs,* 974 F.2d 119, 121 (9th Cir. 1992), cert. denied, 508 U.S. 951 (1993); *Estate of Gilmore, supra* at 720. The United States Court of Appeals for the Seventh Circuit has also explicitly addressed this issue, holding that "there is no constitutional right to be protected by the state against being murdered by criminals or madmen. It is monstrous if the state fails to protect its residents against such predators but it does not violate the due process clause of the Fourteenth Amendment . . . . [The Constitution

does not require] the state to provide services, even so elementary a service as maintaining law and order." *Bowers* v. *DeVito*, 686 F.2d 616, 618 (7th Cir. 1982).

The facts pleaded in Brum *vs*. Dartmouth indicate that Robinson's death was caused by three private individuals who invaded the school uninvited, none of whom can be considered a school official or in any way an agent of the State. Therefore, unless an exception to the reasoning of *DeShaney* applies to this case, the school owed no duty of protection to Robinson, and Brum's claim must fail.

Brum asserts that she has stated a valid claim under § 1983 because her case falls within two exceptions to the rule of *DeShaney* that the government has no duty to protect individuals from harm at the hands of private actors.[12]

First, Brum argues that her son was in a "special relationship" with the school. When such a relationship exists, the government has an affirmative duty to protect an individual from private harm. The *DeShaney* Court explicitly noted this "special relationship" exception to its ruling, but spoke of it only in terms of custody situations, mentioning, by way of example, incarcerated individuals and those who have been involuntarily committed to state psychiatric facilities. See *DeShaney, supra* at 200. See also *Jones* v. *Phyfer*, 761 F.2d 642, 644-645 (11th Cir. 1985). "[W]hen the State takes a person into

---

[12]Brum provides at least two other arguments why she has stated a valid cause of action despite the rule of *DeShaney* v. *Winnebago County Dep't of Social Servs.*, 489 U.S. 189 (1989). The first, and most curious, is that *DeShaney*'s holding that the due process clause "does not protect people from private violence" is not "a majority opinion among the jurisdictions." Apart from being incorrect as a matter of fact, this statement would be unhelpful to her case even if it were true. Once the Supreme Court of the United States has decided an issue of law under the United States Constitution, we need not consider whether the majority of the jurisdictions are in agreement.

Second, the plaintiff argues that municipal policymakers may be held liable, regardless of the presence of a "special relationship," see *infra*, under the ruling in *Stoneking* v. *Bradford Area Sch. Dist.*, 882 F.2d 720, 726 (3d Cir. 1989), cert. denied, 493 U.S. 1044 (1990). This argument need not be discussed at length because the holding of *Stoneking* is explicitly limited to violations of constitutional rights by State actors. In a case such as the present one, the United States Court of Appeals for the Third Circuit itself has stated that "§ 1983 liability may not be predicated upon a *Stoneking*-type theory because private actors committed the underlying violative acts." *D.R.* v. *Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1376 (3d Cir. 1992), cert. denied, 506 U.S. 1079 (1993). See *Russell* v. *Fannin County Sch. Dist.*, 784 F. Supp. 1576, 1581 (N.D. Ga. 1992).

its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *DeShaney*, *supra* at 199-200. The source of this duty to the person in custody is neither the government's knowledge of any particular danger to the individual nor any governmental promise of aid to the individual, but the "State's affirmative act of restraining the individual's freedom to act on his own behalf." *Id.* at 200.

Brum urges us either to hold that a special relationship may exist in noncustodial situations or, alternatively, that a high school student is in school custody. The case law interpreting *DeShaney*, however, weighs heavily against any such holding. Several courts have considered whether a special relationship might exist in a noncustodial situation. Although some have indicated a willingness to extend the special relationship exception to circumstances other than prisons or State psychiatric institutions, the concept of custody or State restriction of movement remains central to the creation of a special relationship. See, e.g., *Walton* v. *Alexander*, 20 F.3d 1350, 1355 (5th Cir. 1994), 44 F.3d 1297 (5th Cir. 1995) (special relationship may exist with respect to "other categories of persons in custody by means of 'similar restraints of personal liberty,' " including handicapped students in custody of residential special education school twenty-four hours a day who are "not free to leave" school premises); *Middle Bucks Area Vocational Tech. Sch.*, 972 F.2d 1364, 1369 (3d Cir. 1992); *Estate of Gilmore, supra* at 722 (special relationship might be created if state, by exercising "custody or control . . . effectively strips [victim] of her capacity to defend herself"). Other courts, such as the United States Court of Appeals for the Tenth Circuit in *Graham* v. *Independent Sch. Dist. No. I-89*, 22 F.3d 991, 995 (10th Cir. 1994), have explicitly refused to acknowledge an affirmative duty to protect in the "absence of a custodial relationship." The United States Court of Appeals for the First Circuit, in a case involving harm to a mentally ill person residing at a State-run group home, found no special relationship between the plaintiff and the State because the plaintiff had voluntarily committed himself to the facility; "he was not being held 'against his will,' nor had the state used its sovereign power to 'render[] him unable to care for himself.' " *Monahan* v. *Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 991 (1st Cir. 1992). The court acknowledged the individual's close relationship with the State, but decided that

the case was governed by the general rule of *DeShaney*. See *Monahan, supra* at 990. The State had not taken the "affirmative act" of restraining the plaintiff's liberty; therefore, it had acquired no duty to protect him. *Id.*

Because the Court's opinion in *DeShaney* makes clear that the special relationship exception applies only to individuals in State custody, we must consider whether Robinson was in the custody of the defendants at the time he was murdered. The circuit courts that have considered this question have uniformly decided that a student in Robinson's position is not in the custody of the school.[13] See *infra*. Many cases that have raised the issue have dealt with situations in which the student injured

---

[13]None of the cases on which Brum relies alters this conclusion. The only Federal circuit opinion cited by Brum on this topic is *Doe* v. *Taylor Indep. Sch. Dist.*, 975 F.2d 137, 146 (5th Cir. 1992), cert. denied sub nom. *Caplinger* v. *Doe*, 506 U.S. 1087 (1993). There, the United States Court of Appeals for the Fifth Circuit decided that the State acquired a duty to a student where the State "has in some significant way separated the child from the persons otherwise responsible for taking precautions to shield the child from the social milieu." *Id.* Not only was that opinion vacated and the case reheard, 15 F.3d 443 (5th Cir. 1994), cert. denied sub nom. *Lankford* v. *Doe*, 513 U.S. 815 (1994), but, even if it were still valid, it would be unhelpful to Brum's case because a State-employed teacher, and not a private third party, caused the injury in question in that case, *Taylor Indep Sch. Dist., supra* at 146, and the court specifically noted that the school's duty, "as it pertains to injuries inflicted by someone other than" a school employee, "is not before us." *Id.* at 148 n.14. Moreover, compulsory attendance laws were in effect in that case. See *infra* for a discussion of the relevance of such laws. Brum's reliance on *Waechter* v. *School Dist. No. 14-030 of Cassopolis*, 773 F. Supp. 1005, 1009 (W.D. Mich. 1991) ("[I]t is clear that decedent [student] was in a custodial relationship with defendant [teacher]"), is similarly misplaced because the harm to the student was caused by a public school teacher.

The only other cases cited by Brum for the proposition that schools owe some duty of protection to their students depend on facts involving a situation more analogous to custody than the facts in the instant case. Two district court cases that found that a student is owed some duty of care by the school specifically cited compulsory education laws as a basis for their holdings. See *Lichtler* v. *County of Orange*, 813 F. Supp. 1054, 1056 (S.D.N.Y. 1993); *Pagano* v. *Massapequa Pub. Schs.*, 714 F. Supp. 641, 643 (E.D.N.Y. 1989) (elementary school students, "truancy laws still being in effect, [are] owed some duty of care by defendants"). In holding that compulsory education laws create a duty to protect on the part of school officials, these courts are distinctly in the minority. See *infra*. *Walton* v. *Alexander*, 20 F.3d 1350 (5th Cir. 1994), also cited by Brum, involved a handicapped student attending a residential school who was in the day-and-night custody of school officials and was not allowed to leave the premises.

was mandated by compulsory education laws to be in school at the time the harm occurred. It might be argued that truancy laws create a close analogy to the custodial circumstances described in *DeShaney*. But, even in such cases, the courts have found that a school's authority over its students "cannot be said to create the type of physical custody necessary to bring it within the special relationship noted in *DeShaney*." *Middle Bucks Area Vocational Tech. Sch.*, *supra* at 1372. See *Armijo* v. *Wagon Mound Pub. Schs.*, 159 F.3d. 1253, 1261 (10th Cir. 1998), quoting *Seamons* v. *Snow*, 84 F.3d 1226, 1235-1236 (10th Cir. 1996); *Doe* v. *Hillsboro Indep. Sch. Dist.*, 113 F.3d 1412, 1415 (5th Cir. 1997) ("We decline to hold that compulsory attendance laws alone create a special relationship"); *Dorothy J.* v. *Little Rock Sch. Dist.*, 7 F.3d 729, 732 (8th Cir. 1993) ("state-mandated school attendance does not entail so restrictive a custodial relationship as to impose upon the State the same duty to protect it owes to prison inmates . . . or to the involuntarily institutionalized" [citation omitted]); *Alton Community Unit Sch. Dist. 11*, *supra* at 272-273 ("government, acting through local school administrations, has not rendered its schoolchildren so helpless that an affirmative constitutional duty to protect arises. . . . Schoolchildren are not like mental patients and prisoners such that the state has an affirmative duty to protect them"); *Graham*, *supra* at 994 (United States Court of Appeals for the Tenth Circuit held that "compulsory school attendance laws do not spawn an affirmative duty to protect under the Fourteenth Amendment"); *Maldonado*, *supra* at 731 ("compulsory attendance laws in no way restrain a child's liberty so as to render the child and his parents unable to care for the child's basic needs. Thus, no affirmative duty arises merely on the basis of compulsory attendance laws"); *Arroyo* v. *Pla*, 748 F. Supp. 56, 60 (D.P.R. 1990) ("[a]lthough young children are required by law to attend school and it may be said that these children are under the custody of the state while they attend classes, the determining factor in this case is that the death of [the victim] was caused solely by a private individual"); *Russell* v. *Fannin County Sch. Dist.*, 784 F. Supp. 1576, 1582-1583 (N.D. Ga. 1992). Cf. *Johnson* v. *Dallas Indep. Sch. Dist.*, 38 F.3d 198, 203 (5th Cir. 1994), cert. denied, 514 U.S. 1017 (1995) (finding it "unnecessary" to decide special relationship issue but holding school not liable for injury to student because "[t]here can be no liability of state actors for this random

criminal act unless the fourteenth amendment were to make the schools virtual guarantors of student safety — a rule never yet adopted even for those in society, such as prisoners or the mentally ill or handicapped, who are the beneficiaries of a 'special relationship' with the state").

In cases in which no compulsory education rules apply, courts have decided that the argument against finding a special relationship is even stronger. In *Sargi* v. *Kent City Bd. of Educ.*, 70 F.3d 907, 911 (6th Cir. 1995), for example, the United States Circuit Court of Appeals for the Sixth Circuit held that the school owed no duty to protect a child riding a school bus because a special relationship "can only arise when the state restrains an individual," the child was not compelled by law to ride the school bus, and the fact that alternatives to the school bus "may be limited for practical or financial reasons" was not enough to give rise to a custodial relationship. See *Black* v. *Indiana Area Sch. Dist.*, 985 F.2d 707, 714 (3d Cir. 1993) (no special relationship between school and students molested by private party on school bus where bus riding not compulsory). In *Leffall* v. *Dallas Indep. Sch. Dist.*, 28 F.3d 521, 529 (5th Cir. 1994), the United States Court of Appeals for the Fifth Circuit held that the school owed no duty of protection to a student attending an after-school dance because the student was not compelled to attend and because "any special relationship that may have existed lapsed when compulsory school attendance ended." See also *Santamorena* v. *Georgia Military College*, 147 F.3d 1337, 1341 n.10 (11th Cir. 1998) (no special relationship where parents voluntarily enrolled student in State-run residential military college); *Stevens* v. *Umsted*, 131 F.3d 697, 703 (7th Cir. 1997) (no special relationship between State and mentally handicapped student where parents voluntarily enrolled student in State-run residential school); *Mitchell* v. *Duval County Sch. Bd.*, 107 F.3d 837, 838-840 (11th Cir. 1997) (no special relationship between student and school when student was killed by private party during voluntary school-sponsored program). But see *Spivey* v. *Elliott*, 41 F.3d 1497, 1526 (11th Cir. 1994) (special relationship existed between State and student in residential school for the deaf, even though parents voluntarily enrolled student in school; "question is not so much how the individual got into state custody, but to what extent the State exercises dominion and control over that individual").

In the instant case, Brum's son, who had passed his sixteenth

birthday on the day he was killed, was not compelled to attend school. See G. L. c. 76, § 1. Robinson was not in a custodial relationship with the school, nor was he in a situation so analogous to custody as to create a due process right to be protected by the defendants from harm.[14]

This outcome is not changed by Brum's allegation that the defendants were aware of the danger to Robinson on the day he was killed. The *DeShaney* Court specifically stated that the source of the special relationship between the government and those in its custody is not a "knowledge of the individual's predicament." *DeShaney, supra* at 200. Other courts have held that where a third party, and not a government actor, injured the plaintiff, the fact that the government defendants were aware of the potential danger did not render them liable. See *Graham, supra* at 994 ("foreseeability [of the danger] cannot create an affirmative duty to protect when plaintiff remains unable to allege a custodial relationship"); *Estate of Gilmore, supra* at 722 (rejecting argument that knowledge that "third party poses a special danger to an identified victim will alone support a claim for relief under section 1983"); *Arroyo, supra* at 61 ("[a]lthough the defendants may have known of other shooting incidents or violent acts that had taken place on school premises, the injury here was caused by a third person and not by a school official"); *Russell, supra* at 1581 (citing *DeShaney* as deciding "even when state officials know that a person is in imminent harm from a third party," United States Constitution imposes no duty to protect). Nor does the fact that the defendants may have had a state-law duty under G. L. c. 71, § 37H, to adopt security policies expose them to liability under § 1983. "[I]n light of *DeShaney*, the Court cannot rely on state laws that impose on state agents an affirmative duty of protection as the premise for federal constitutional liability when the injury is caused by a private third person." *Arroyo, supra* at 60. Section 1983 does not create a Federal right of action for every act that may be actionable under State law, see *Martinez, supra* at 285, and acts

---

[14]Because Brum has not stated a viable cause of action under the due process clause and § 1983, this court need not address her claim that the defendants acted with "deliberate indifference" to the threat of harm to Robinson. Even if the alleged indifference violated some duty under state tort law, because the defendants' "misconduct violated no constitutional duty . . . [the plaintiff's] remedies . . . lie in the arena of tort, not constitutional law." *Monahan* v. *Dorchester Counseling Ctr., Inc.*, 961 F.2d 987, 990-991 (1st Cir. 1992).

that are merely negligent based upon State law principles do not necessarily implicate the due process clause, see *Daniels, supra* at 328 (neither "negligent act[s] of an official causing unintended loss of or injury to life, liberty, or property" nor "mere lack of due care by a state official" implicates due process clause of Fourteenth Amendment).

The plaintiff in Brum *vs*. Dartmouth also argues that her case falls within the "state-created danger" exception to the rule of *DeShaney*. This doctrine is derived from the *DeShaney* Court's comment that the State had "played no part in [the dangers'] creation, nor did it do anything to render [the plaintiff] any more vulnerable to them." *DeShaney, supra* at 201. It is used by the courts that have adopted it "to find a constitutional tort duty under § 1983 outside of a strictly custodial context," *Middle Bucks Area Vocational Tech. Sch., supra* at 1373; see *L.W.* v. *Grubbs, supra* at 122, and provides that the government may have a duty to protect an individual from harm by a third party where the State actor was culpable in "affirmatively placing an individual in a position of danger, effectively stripping a person of her ability to defend herself, or cutting off potential sources of private aid," *Johnson* v. *Dallas Indep. Sch. Dist., supra* at 201.

The courts that have adopted this doctrine have uniformly held that, to be liable under it, a government defendant must have committed an affirmative act placing the victim in danger. It must have "used [its] authority to create an opportunity that would not otherwise have existed for the third party's crime to occur." *Id.* See *Middle Bucks Area Vocational Tech. Sch., supra* at 1374-1375 (liability "predicated upon the states' affirmative acts which work to plaintiffs' detriments in terms of exposure to danger . . . [T]he state can fairly be said to have affirmatively acted to create the danger to the victims"); *L.W.* v. *Grubbs, supra* at 121; *Estate of Gilmore, supra* at 721-722 (furloughed prisoner who murdered plaintiff's decedent "was in no sense an agent of the state. The state played no part in creating the threat that [he] posed to [the decedent], [his] murderous design was independently conceived and executed, and the state neither condoned nor encouraged his behavior"). As the United States Court of Appeals for the First and Eighth Circuits have written, merely increasing an already existing risk of harm from a private source is insufficient to create governmental liability under this doctrine. See *Monahan, supra* at 993 (rendering plaintiff "more

vulnerable to danger" not "the kind of 'affirmative act' " giving rise to constitutional duty); *Dorothy J.* v. *Little Rock Sch. Dist.*, 7 F.3d 729, 734 (8th Cir. 1993). "Such a ruling would make § 1983 virtually coterminous with traditional tort law, the very expansion of constitutional tort liability that the Supreme Court has rejected." *Dorothy J., supra* at 734. Nor is failure to protect an individual from injury at the hands of a private actor the type of act which confers liability under this doctrine. See *Monahan, supra* at 993.

Courts have rejected application of this doctrine in circumstances very similar to those in the instant case. For example, in *Graham* v. *Independent School Dist. No. I-89, supra* at 995, a student was killed by another student who, to school officials' knowledge, had previously threatened the victim and was on school grounds with a gun, and school officials failed to protect the victim from this known threat. Yet the court held that the school was not liable under the State-created danger doctrine because plaintiffs could not "point to any affirmative actions by the defendants that created or increased the danger to the victim[]." *Id.* See *Johnson* v. *Dallas Indep. Sch. Dist., supra* at 202 (rejecting liability under State-created danger doctrine because "[n]o state actor placed [the student] in a 'unique, confrontational encounter' with a violent criminal . . . . No official in the performance of her duties abandoned him in a crack house or released a known criminal in front of his locker. . . . [T]he facts here pleaded suggest only that [the student] was the tragic victim of random criminal conduct rather than of school officials' deliberate, callous decisions to interpose him in the midst of a criminally dangerous environment"); *Sargi, supra* at 913 ("no evidence that the Board took any affirmative action that exposed decedent to any danger to which she was not already exposed").

The defendants in the instant case did not create the danger that resulted in Robinson's death. They neither created the three assailants' murderous intent nor invited them onto school property. "The most that can be said of the state functionaries in this case is that they stood by and did nothing when suspicious circumstances dictated a more active role for them." *De-Shaney, supra* at 203. This inaction does not make the defendants liable under § 1983. See *id.*; *Graham, supra* at 995 ("Inaction by the state in the face of a known danger is not enough to trigger the obligation [to protect]; according to *De-*

*Shaney*, the state must have limited in some way the liberty of a citizen to act on his own behalf"); *Estate of Gilmore, supra* at 721 (no liability under § 1983 because, "irrespective of any knowledge the state defendants had of the special danger that [the assailant] posed to [the victim, it] did nothing to render [her] any more or less capable of defending herself from a violent attacker than any other member of the general public"). Nor does the defendants' failure, if any, to follow the State law requirements of G. L. c. 71, § 37H, make them liable under the State-created danger doctrine. See *Middle Bucks Area Vocational Tech. Sch., supra* at 1375.

Because the plaintiff in Brum *vs.* Dartmouth has failed to allege a violation of any constitutional right, she has not made out a valid claim under 42 U.S.C. § 1983. We need not, therefore, address the parties' arguments regarding the availability to defendants of a qualified immunity defense. See *Estate of Gilmore, supra* at 723; *Russell* v. *Fannin County Sch. Dist.*, 784 F. Supp. 1576, 1582-1583 (N.D. Ga. 1992).

### B

The plaintiff in Brum *vs.* Dartmouth claims that she is entitled to recover under the Massachusetts Civil Rights Act, G. L. c. 12, § 11I, because the defendants interfered with Robinson's constitutional right to life. In order to make out a claim under § 11I,[15] which incorporates by reference G. L. c. 12, § 11H, the plaintiff must prove that the defendants used "threats, intimidation or coercion" to interfere with, or attempt to interfere with, rights secured by the Constitution or laws of the United States

---

[15]General Laws c. 12, § 11I, provides: "Any person whose exercise or enjoyment of rights secured by the constitution or laws of the United States, or of rights secured by the constitution or laws of the commonwealth, has been interfered with, or attempted to be interfered with, as described in section 11H, may institute and prosecute in his own name and on his own behalf a civil action for injunctive and other appropriate equitable relief . . . including the award of compensatory money damages."

General Laws c. 12, § 11H, referred to by § 11I, states: "Whenever any person or persons, whether or not acting under color of law, interfere by threats, intimidation or coercion, or attempt to interfere by threats, intimidation or coercion, with the exercise or enjoyment by any other person or persons of rights secured by the constitution or laws . . . of the commonwealth, the attorney general may bring a civil action for injunctive or other appropriate equitable relief."

or the Commonwealth of Massachusetts. *Freeman* v. *Planning Bd. of W. Boylston*, 419 Mass. 548, 564, cert. denied, 516 U.S. 931 (1995), quoting *Bally* v. *Northeastern Univ.*, 403 Mass. 713, 717 (1989). As the Appeals Court noted, the Superior Court judge correctly held that the "complaint failed to allege, however liberally construed, the requisite threats, intimidation or coercion required to give rise to a claim under" G. L. c. 12, § 11I.[16]

## VI

In Brum *vs.* Dartmouth, the judgment of the Superior Court is affirmed.[17]

In King *vs.* Commonwealth, the Superior Court's order denying the defendants' motion to dismiss is reversed.

*So ordered.*


IRELAND, J. (concurring, with whom Abrams and Marshall, JJ., join). I agree that G. L. c. 258, § 10 (*j*), as it has been written, and *DeShaney* v. *Winnebago County Dep't of Social Servs.*, 489 U.S. 189 (1989), compel the result we reach today in both of these cases. I believe, however, that the result in Brum *vs.* Dartmouth is unfortunate. Although constrained by the words of the statute and the reasoning of the United States Supreme Court in *DeShaney* to reach that result, I believe that the practical effect of today's ruling is wrong because I think that parents reasonably should be able to expect that the schools to which they entrust their children will take reasonable steps to protect their children from harm where, as here, the school officials are put on notice that the children are or may well be in jeopardy.

[16]The plaintiff's argument on appeal that the defendants' failure to provide a safe environment constituted a "non-physical threat to students' well-being" is purely semantic and borders on the frivolous. Although the word "threat" may be used to connote "danger," as it does in Brum's argument, that meaning of the word is obviously not the one intended in § 11H.

[17]We are in complete sympathy with the concurrence's observations that it is unfortunate that school officials should escape all legal accountability for their failure to protect the children under their supervision. As the concurrence appears to acknowledge, it would, however, distort the general regime of § 10 (*j*) to interpret its provision, which speaks to tort liability in a wide range of circumstances, to achieve a satisfactory result in this special category of case. This is a task for the Legislature.

Local schools lie at the heart of our communities. Each morning, parents across the Commonwealth send their children off to school. They entrust the schools with nothing less than the safety and well-being of those most dear to them — their own children. No arm of government touches more closely the core of our families and our children than our schools. *Care & Protection of Charles*, 399 Mass. 324, 334-335 (1987), reminds us of the "crucial importance" we all place "in the education of [our] children." *Id.* at 335. Underlying the crucial role schools play in our children's lives and, in fact, the entire relationship between school and family is the parents' basic assumption that school officials will do all they can to protect the children who they entrust to the school's care. In apparent recognition of this responsibility, the Legislature requires that each school district implement and publish "standards and procedures *to assure* school building security and *safety of students* and school personnel" (emphasis supplied). G. L. c. 71, § 37H. One could reasonably assume from that that the security measures mandated by the statute are intended to protect students against dangers "originally caused" by persons other than "the public employer" who happens to be on school property.

In the present case, the school principal was told that the assailants had threatened to return to the school and retaliate against the students who were involved in a prior altercation. Apparently, the school took no action in response to that warning. Several school officials then witnessed three armed individuals enter the school, but again they took no action. Those armed individuals then stabbed Robinson to death in front of his classmates as he sat in a classroom. At the time that he was stabbed, the school's security "standards and procedures" — if one could refer to them as such — consisted of a "no-trespassing" sign and a sign asking visitors to report to the school office. See *ante* at 691. On such facts, parents should be able to submit to a jury the claim that the school breached a duty owed to them.

While G. L. c. 71, § 37H, G. L. c. 258, § 10 (*j*), and *DeShaney, supra,* may compel the outcome we reach today, I believe that parents should be entitled to believe that the school officials to whom they entrust their children will not be deliberately indifferent and simply stand by and do nothing when made aware of an imminent threat to the safety of their

children. I believe, too, that school officials should not be allowed to figuratively shrug and say, "the problem did not originate with us, so we are not responsible." While not absolute guarantors of safety, school officials should, at the least, be expected to take reasonable measures to protect children when they have advance notice of danger.

This entire matter is within the control of the Legislature, which, I hope, will act to impose an obligation on school districts, and to ensure that the restrictions in the Massachusetts Tort Claims Act do not apply to these cases.