RICHARD J. McCARTHY, administrator,[1] vs. CITY OF WALTHAM
(and a companion case[2]).

Nos. 08-P-586 & 09-P-525.

Middlesex. September 11, 2009. - April 9, 2010.

Present: DUFFLY, GRAHAM, & FECTEAU, JJ.

*Governmental Immunity. Municipal Corporations,* Governmental immunity,
Liability for tort. *Negligence,* Governmental immunity. *Massachusetts Tort
Claims Act. Wrongful Death. Practice, Civil,* Directed verdict, Judgment
notwithstanding verdict.

At the trial of a civil action for the wrongful death of the plaintiff's decedent,
who committed suicide shortly after being released from protective custody
by a city police department, in which the plaintiff alleged that the police
negligently failed to notify by telephone certain members of the decedent's
family prior to his release, a judge erred in denying the city's motions for
a directed verdict and for judgment notwithstanding the verdict, where
evidence that the police made explicit and specific assurances of safety or
assistance to the decedent's family members, viewed in the light most
favorable to the plaintiff, was insufficient as a matter of law to overcome
the immunity afforded the city under the Massachusetts Tort Claims Act,
G. L. c. 258, § 10(j). [560-563]
In the circumstances of a civil action against a city for the wrongful death of
the plaintiff's decedent, a judge did not err in denying the city's motion for
a directed verdict on the ground of immunity under G. L. c. 258, § 10(a),
where the issue was not sufficiently established by the evidence as a mat-
ter of law; however, the judge erred in declining to instruct the jury on the
issue, which presented a question of fact for the jury's consideration
[563-564]; on the other hand, the judge not only properly denied the city's
motion for a directed verdict on the ground of immunity under G. L.
c. 258, § 10(h), but also correctly omitted from his instructions any refer-
ence to the issue [564]; likewise, there was no error in the exclusion of the

[1] Of the estate of James M. McCarthy.

[2] The companion case involves the same parties. The city filed another,
related appeal to this court (No. 09-P-525), in which the city claims that the
trial judge erroneously declined to expand the appellate record in the above-
captioned appeal to include a note, presumably from a trial juror, which was
neither docketed nor referenced in the transcript. Given the result we reach,
there is no need to address the issue raised therein, and we dismiss that
appeal. The plaintiff's request for attorney's fees in that case is denied.

application of immunity under G. L. c. 258, § 10(*i*), to the plaintiff's claim, where the intent of that provision is to allow a form of remedy to those injured by the actions of the released person, rather than for injuries to the person released from custody [564-565].

CIVIL ACTION commenced in the Superior Court Department on November 23, 1999.

A motion for summary judgment was heard by *Bonnie H. MacLeod-Mancuso*, J., and the case was tried before *Thayer Fremont-Smith*, J.

*Michelle Learned*, Assistant City Solicitor, for city of Waltham.

*Timothy G. Lynch* for Richard J. McCarthy.

FECTEAU, J. The city of Waltham (city) appeals from a Superior Court judgment awarding the plaintiff $100,000 under the provisions of the Massachusetts Tort Claims Act (MTCA), G. L. c. 258, § 2, and under G. L. c. 229, § 2,[3] for the wrongful death of his son, James McCarthy (James). James had been held in protective custody by city police, and he committed suicide shortly after they released him. During trial, the plaintiff claimed that the police were negligent for failing to call James's family members prior to releasing him. The plaintiff contends that the police made explicit promises to him and to James's aunt, Betty Ann Marino (Marino), that someone from the police department would notify Marino before releasing James so that she could be present to take him into her care. Instead, the police simply released James without making the telephone call. The plaintiff does not contend that the police were negligent in placing James in custody, in failing to adequately protect James while in custody, or in failing to keep him in custody.

On appeal, the city generally contends that it was entitled to sovereign immunity pursuant to G. L. c. 258, § 10, and the judge wrongly denied these protections. The city claims that the trial judge wrongly denied its motions for directed verdict and

[3]The plaintiff's complaint included a civil rights claim under the provisions of 42 U.S.C. § 1983 (2006), and was first filed in the Superior Court; it was removed to the United States District Court for the District of Massachusetts in 2000. In 2002, the United States District Court severed the case, retained the civil rights claim, and remanded the State law claims to the Superior Court.

judgment notwithstanding the verdict (JNOV) and that the judge erred in not instructing the jury in accordance with its requested instructions.[4] We reverse.

1. *Background.* On March 4, 1997, at approximately 3:43 A.M., the plaintiff, a resident of Florida, called the city's 911 system and said that he had just received a disturbing telephone call from his son James, who lived in the city. The plaintiff told the dispatcher that he thought James "might be having an overdose . . . he's sounding real bad . . . saying 'I love you,' and, you know, you can just barely understand him."[5] The dispatcher[6] then radioed that "somebody might be committing suicide" with "some sort of drugs."[7] Officer Palmer responded to the radio alert and drove to James's apartment. He heard James yelling from inside the apartment and asked him to come outside; James complied. Officer Palmer told James his father had called the police. James denied the possibility that he was going to harm himself by taking drugs or by other means. During this conversation, James became increasingly louder and upset and yelled at the officer. Officer Palmer then took James into protective custody as an "incapacitated person" because he smelled of alcohol, seemed intoxicated, and did not respond to the officer's request to calm down. James never told Officer Palmer that he was suicidal at the scene, during their ride to the police station, or during booking. James was booked around 4:00 A.M. He denied any conversation with his father in which he was despondent and denied any attempt at or contemplation of suicide, although he made statements indicating that he was upset.[8] The booking officer did not

---

[4]Other than the city's requested jury instructions that relate to our discussion of sovereign immunity under the MTCA (see *infra*), we need not address other issues the city raised.

[5]Transcripts of the telephone calls were entered as exhibits and tape recordings of the calls were played for the jury.

[6]This dispatcher does not appear to have been identified. The dispatchers who received later calls from the plaintiff at 4:03 A.M., and from Marino at 5:32 and 8:15 A.M., were each different police cadets and employees of the city police department; there was a shift change at 7:00 A.M.

[7]Neither in the initial call nor in any subsequent call from the plaintiff or Marino did either one say specifically that they suspected or feared that James was suicidal.

[8]He stated during booking that he had been arrested the night before, and that the "world sucks, . . . I lost my job, my daughter, and everything else,

observe any signs during booking indicative of suicidal thoughts or intentions.

At 4:03 A.M., the plaintiff called the police, inquiring about James. He was told by another dispatcher that James was now at the station. The plaintiff asked the dispatcher to have James call him when they finished with James's booking, which the dispatcher agreed to do. The plaintiff asked what was wrong with James and was told that "he was talking about, uhm, contemplating suicide."[9] James's father was told that James would be kept eight or twelve hours.

At 5:32 A.M., Marino, who resided in Westborough, called the 911 emergency telephone line and asked when James would be released. A police cadet, acting as dispatcher, informed Marino that she did not know when that would be but that James would be able to make a telephone call when released. Marino expressed concern because she did not think that James would make the call, and she wanted to be there when he was released. The conversation continued in this vein, and the dispatcher said, "I could have the person who's — releases him have them give you a call to tell you that he's going to be released, and then, like, maybe ten minutes before he gets released so that you can be on your way down here." Marino replied, "[I]f an officer could call us and give us, you know, 15, 20 minutes to get there —," to which the dispatcher said, "Yup. No problem."[10] Marino gave her telephone number to the dispatcher, who wrote it on the booking sheet with this notation: "when released call Aunt Bettie Marino, . . . she'll be here to pick him up."

At 7:00 A.M., another cadet dispatcher replaced the cadet who

. . . [and] I don't even know what I'm doing here." The record shows that James had been arrested the night before for domestic assault and a restraining order had issued.

[9]This dispatcher explained that this information was given because of the "Q5" code placed on the police computer system by the dispatcher who took the initial 911 emergency telephone call that indicated psychological-suicide evaluation as a reason for the call. This "Q5" code sends an inquiry, via computer, to determine if any police department system recorded suicidal attempts or ideation, which in this case did not reveal any records of such ideation.

[10]There is evidence to suggest that, depending upon the hour and the traffic conditions, the time to make the ride from Westborough to Waltham might range from twenty-five minutes to one hour.

had spoken with James's aunt and father. At 8:15 A.M., Marino called again, asking what time James was going to be released and if James could call her at her work in about fifteen minutes. She was told by the dispatcher that they wanted James to sleep it off, so he was not sure what time James would be released but if she left her number, "when he wakes up, . . . and we're ready to release him, I can have him call you then." She answered, "I hope he will." She reported that she was going to work, but she would leave her telephone for her husband to answer. She also gave her work number in case no one answered her first number. Both numbers were written on a note attached to the booking sheet. The 911 tape also recorded a statement overheard in which she said to her husband that "they're going to call . . . ." She explained at trial that she misunderstood the last words of the dispatcher to mean that "I'll call you." During her testimony, she also described her expectation that the police "weren't going to release him until they called me so [I] could pick him up and take him from them," and that "all I wanted them to do was to keep him safe until we got there," although Marino admitted that she was uncertain that James would have actually accompanied her.

During the five hours James was in custody, he was under video monitoring by the dispatchers. There were no other calls made to or from police before James was released at approximately 9:00 A.M. Videotapes of James at the booking desk at 4:00 and 9:00 A.M. were shown to the jury. Approximately one hour after his release, James's sister, accompanied by her boyfriend, went to James's apartment, where they found him hanging from a pipe. They left to call for help, and upon the arrival of police and paramedics, James was cut down and a pulse was detected. He never regained consciousness and was pronounced dead the next day.

Before trial, the city filed a motion for summary judgment, which was denied. The city contended that it was not negligent in the handling of the custody and release of James and that it was immune from plaintiff's claims pursuant to G. L. c. 258, § 10. In her decision, the motion judge concluded generally that "[t]he current claim does not stem from the fact that the police were negligent in their release of the Decedent, but rather that the police were negligent in failing to carry out their promises

to inform the Decedent's family of his release." While the motion judge specifically referenced three of the four immunities the city raised, she denied the city's motion for summary judgment based primarily on § 10(*j*)(1).[11] See *Lawrence* v. *Cambridge*, 422 Mass. 406, 411-413 (1996).

The city did not appeal from the denial of the motion, and a three-day jury trial began on October 4, 2006. The issues for the jury at trial were (1) whether the police were negligent in the manner of James's release from custody, (2) whether the police made explicit and specific assurances of safety or assistance to one or more of the McCarthy family in regard to the manner of James's release, and (3) whether James's suicide resulted, at least in part, from the family's reliance on such assurances. The jury returned its special verdict in favor of the plaintiff on October 10, 2006, and awarded him $100,000.

2. *Discussion.* The city's general argument on appeal focuses on what it contends was the trial judge's misapplication of the exception to immunity contained in G. L. c. 258, § 10(*j*)(1). In pertinent part, the provisions of § 10(*j*) immunize the city from

> "any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation . . . which is not originally caused by the public employer or any other person acting on behalf of the public employer."

By virtue of § 10(*j*)(1), however, that immunity is inapplicable to

> "any claim based upon explicit and specific assurances of safety or assistance . . . made to the direct victim or a member of his family or household by a public employee, provided that the injury resulted in part from reliance on those assurances."

---

[11]General Laws c. 258, § 10(*j*)(1), as amended by St. 1993, c. 495, § 57, states in relevant part that the exclusions from liability represented by the immunities of § 10(*h*) and 10(*j*) "shall not apply to: (1) any claim based upon explicit and specific assurances of safety or assistance, beyond general representations that investigation or assistance will be or has been undertaken, made to the direct victim or a member of his family or household by a public employee, provided that the injury resulted in part from reliance on those assurances."

The city contends that the trial judge, like the motion judge,[12] focused solely on the exception contained in § 10(*j*)(1), in the process failing to give appropriate weight to the immunity contained in § 10(*j*) itself, and to the other immunities § 10 contains.

a. *Directed verdict.* "The denial of a motion for directed verdict or a motion for judgment notwithstanding the verdict both present questions of law reviewed under the same standard used by the trial judge. Review of these motions requires us to construe the evidence in the light most favorable to the nonmoving party and disregard that favorable to the moving party. In other words, the standard to be employed is whether the evidence, construed against the moving party, justifies a verdict against him. Our duty . . . is to evaluate whether anywhere in the evidence, from whatever source derived, any combination of circumstances could be found from which a reasonable inference could be made in favor of the nonmovant." (Internal quotations and citations omitted.) *O'Brien* v. *Pearson*, 449 Mass. 377, 383 (2007).

The city's motion for a directed verdict should have been allowed because the evidence that the police made "explicit and specific assurances of safety or assistance" to James's family members, when viewed in the light most favorable to the plaintiff, *Michnik-Zilberman* v. *Gordon's Liquor, Inc.*, 390 Mass. 6, 7 n.1 (1983), was insufficient, as matter of law, to overcome the immunity afforded the city under G. L. c. 258, § 10(*j*). By focusing on the manner in which James was released, the judge elevated the exception to sovereign immunity so that it became, in effect, an independent theory trumping all the immunity provisions of the MTCA under which the city sought protection.[13]

---

[12]In ruling on the city's motion for summary judgment, the motion judge considered the city's immunity arguments solely under G. L. c. 258, § 10(*j*)(1). The motion judge appears not to have considered or analyzed the separate and independent nature of the § 10 immunities. By doing so she implied that the exception was sufficient to overcome possible applications of immunities other than § 10(*j*), an implication that is contrary to settled law holding that the immunities under § 10 have alternative effect. See *Brum* v. *Dartmouth*, 428 Mass. 684, 697 (1999) ("The immunities provided by § 10 operate in the alternative; even if one immunity contains an exception that would permit a claim to be brought, that claim is barred if any of the other immunities apply").

[13]In addition to the immunity of G. L. c. 258, § 10(*j*), the city claimed

In *Jacome* v. *Commonwealth*, 56 Mass. App. Ct. 486, 493 (2002), we stated, "[T]he Commonwealth did not originally cause the condition or situation which brought about the harm, and thus was immune from suit for the loss. Hence claims arising from circumstances intimately related to that condition or situation, and the resulting harm, are also barred. The alternative would be to permit imaginative pleading and fractionalizing of the claims that would undo the immunity that § 10(*j*) preserves."

"The Massachusetts Tort Claims Act, G. L. c. 258 . . . , allows those with valid claims in tort to recover against governmental entities." *Lawrence* v. *Cambridge*, 422 Mass. at 408.[14] General Laws c. 258, § 10(*j*), "establishes that the Commonwealth shall, with certain exceptions, be immune with respect to 'any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer.' " *Jacome* v. *Commonwealth, supra* at 489. The plaintiff does not suggest that the city's actions were an original cause of harm; otherwise, he would not have needed to rely on the exception to immunity that § 10(*j*)(1) provides. Furthermore, there can be no serious question that the original cause of harm in James's taking of his own life was his suicidal frame of mind; any other cause for which the city might be perceived as a responsible actor would likely have been too remote or too passive. See *Brum* v. *Dartmouth*, 428 Mass. 684, 695 (1999) (in light of intention of § 10[*j*] "to provide some substantial measure of immunity from tort liability to government employers . . . we must not adopt an interpretation of the statute that construes the words 'originally caused' so broadly as to encompass the remotest causation and preclude immunity in nearly all circumstances").

"The exception to immunity contained in G. L. c. 258, § 10(*j*)(1), . . . requires that 'explicit' and 'specific' assurances

<hr>

protection under § 10(*a*), (*h*), and (*i*). See discussion of those sections in part 2(b) of this opinion, *infra*.

[14]The city argues that the plaintiff's presentment letter was defective because it did not specify the claim upon which he relied at trial. However, we think that the city waived this issue because it did not deny issues raised in the letter "specifically and with particularity." *G & B Assocs., Inc.* v. *Springfield*, 39 Mass. App. Ct. 51, 55 (1995).

of safety, beyond general representations, be made by an officer. The phrase 'explicit and specific assurances' requires 'a spoken or written assurance, not one implied from the conduct of the parties or the situation,' and the 'terms of the assurance must be definite, fixed, and free from ambiguity.' " *Ariel* v. *Kingston*, 69 Mass. App. Ct. 290, 293 (2007), quoting from *Lawrence* v. *Cambridge*, 422 Mass. at 410. The court in *Lawrence* also noted the definitions of " '[e]xplicit' . . . as 'characterized by full clear expression: being without vagueness or ambiguity: leaving nothing implied,' and '[s]pecific' . . . as 'characterized by precise formulation or accurate restriction.' " 422 Mass. at 410 n.5, quoting from Webster's Third New Intl. Dictionary 801, 2187 (1993).

There was insufficient evidence that the police made specific and explicit assurances in the series of telephone calls between James's family and the police. Specifically, the record does not show that any 911 dispatcher ever told the plaintiff or James's aunt that the police would not release James until someone got to the station. The plaintiff principally relies on the conversation that occurred at 5:32 A.M., the first time Marino called the police and asked when James would be released. The dispatcher had said, "I could have the person who's — releases him have them give you a call to tell you that he's going to be released, and then, like, maybe ten minutes before he gets released so that you can be on your way down here." This is the closest to a promise of assurance in any of the family's conversations with the dispatchers, but insufficient in our view, as we conclude, as matter of law, that this does not constitute an assurance or promise of safety or assistance.

Further, at 8:15 A.M., forty-five minutes before James was released, Marino called the police station again and spoke with a different dispatcher who stated, "[W]hen he wakes up, . . . and we're ready to release him, I can have him call you then." Whatever assurances Marino thought the dispatcher gave from the 5:32 A.M. conversation were dissipated by the 8:15 A.M. conversation. Cf. *Lawrence* v. *Cambridge, supra* at 412.

This latter statement did not contain a promise to Marino that the police would call her before James was released, and Marino's reply, "I hope he will [call me]," indicates to us that

Marino herself did not think the police had promised her they would call before releasing James. "While § 10(*j*)(1) requires 'that the injury result[] in part from [the promisee's] reliance on [the] assurance,' such reliance cannot supply the terms that cause the assurance to suffer from a lack of specificity at the time it was made." *Id.* at 411. It is unreasonable to interpret this 8:15 A.M. conversation as an explicit or specific promise or assurance of safety or assistance; additionally, this last conversation at 8:15 A.M. could be interpreted as a withdrawal of previous assurances. "We note also that if the police had withdrawn the promise, no further reliance on it would be warranted and by the terms of the statute the city's exposure to liability would cease." *Id.* at 412.

Thus, in the light most favorable to the plaintiff, the trial judge erred in denying the city's motions for directed verdict and JNOV, since a jury could not rationally conclude, without engaging in speculation or conjecture, that there was sufficient evidence of explicit and specific assurance of safety or assistance in order to overcome the protection that the immunity of § 10(*j*) afforded the city "with respect to *any* claim for a loss not originally caused by the public employer." *Jacome* v. *Commonwealth*, 56 Mass. App. Ct. at 489.[15]

b. *Other issues.* While they do not affect our decision, we briefly address other issues raised by the city that relate to its additional claims of immunity.

i. *General Laws c. 258, § 10(*a*).* We find no error in the judge's denial of the city's motion for directed verdict on the ground that immunity under G. L. c. 258, § 10(*a*), applied to the plaintiff's claim. Section 10(*a*) provides immunity from "any claim based upon an act or omission of a public employee when such employee is exercising due care in the execution of any statute or any regulation of a public employer . . . ." That the plaintiff's claims were subsumed within the protective custody requirements of G. L. c. 111B, § 8, fifth par. (providing, in relevant part, that "an incapacitated person may be held

---

[15]The city also requested an instruction about the immunity under § 10(*j*), and objected to its omission. There is no reason apparent in this record to justify the failure to provide instruction to the jury informing them of the immunity under § 10(*j*), to which the exception under § 10(*j*)(1) relates, and it was error to have failed to provide the instruction.

in protective custody . . . until he is no longer incapacitated or for a period of not longer than twelve hours, whichever is shorter"), was not sufficiently established by the evidence; the immunity of § 10(*a*) was not so clearly established, as matter of law, that the city's motion for a directed verdict should have been allowed on this basis. However, the relationship of the plaintiff's claim with the city's duty to comply with G. L. c. 111B, § 8, fifth par., and whether this relationship provided immunity under the provisions of § 10(*a*) was an issue of fact fairly raised by the evidence that the jury should have been allowed to consider. If the jury were to decide that the facts were sufficient to establish this immunity, the remaining question whether there were explicit and specific assurances would no longer have been applicable, as each statutory immunity stands independently and alternatively. See *Ariel* v. *Kingston,* 69 Mass. App. Ct. at 293-294 (error for trial judge to conclude that, notwithstanding the availability of immunity under other provisions of § 10, the § 10[*j*][2] exception arguably applied and so the case could proceed to the jury). By not instructing the jury on § 10(*a*) immunity, the judge erroneously removed it from the jury's consideration; the facts were not clearly established in the evidence either way, and the jury were entitled to analyze the facts against both theories of the case.

ii. *General Laws c. 258, § 10(*h*).* The city also contends that it had immunity under G. L. c. 258, § 10(*h*), which provides immunity from "any claim based upon the failure . . . to provide adequate police protection, prevent the commission of crimes, investigate, detect or solve crimes, identify or apprehend criminals or suspects, arrest or detain suspects, or enforce any law . . . but not including claims based upon . . . or as otherwise provided in clause (1) of subparagraph (*j*)." Therefore, as with the immunity provision discussed above, a promise or assurance of safety or assistance can operate as an exception to this immunity. We fail to see how this would apply to the circumstances here. We think the judge correctly declined to direct a verdict in favor of the city on this ground and correctly omitted from his instructions any reference to this immunity provision.

iii. *General Laws c. 258, § 10(*i*).* Section 10(*i*) provides immunity from "an[y] claim based upon the release, parole, furlough or escape of any person, including but not limited to a

. . . detainee, . . . patient or client, from the custody of a public employee or employer or their agents, *unless gross negligence is shown in allowing such release, parole, furlough or escape*" (emphasis added). Although it does not appear that any case has discussed whether this section is applicable to a claim for injuries to the person released from custody, in addition to third parties who are injured by the person released, we conclude that the rulings of the motion and trial judges that excluded application of this form of immunity to the plaintiff's claim were not erroneous. In our view, the intent of the statute is to allow a form of remedy to those injured by the actions of the person released. See *Kent* v. *Commonwealth*, 437 Mass. 312 (2002). This intention is inferred from the language emphasized above that creates an exception to immunity when "gross negligence is shown in allowing such release, parole, furlough or escape."

In case no. 08-P-586, the judgment is reversed, the verdict is set aside, and judgment shall enter for the city. In case no. 09-P-525, the appeal is dismissed, not on the merits, but because it is moot.

*So ordered.*