MARILYN LEBLANC & another[1] vs. COMMONWEALTH
& another.[2]

Suffolk. March 2, 2010. - June 11, 2010.

Present: MARSHALL, C.J., IRELAND, SPINA, COWIN, CORDY, BOTSFORD, & GANTS, JJ.

*Massachusetts Tort Claims Act. Office of Chief Medical Examiner. Negligence,*
Public employee, Public officer.

Discussion of the statutory framework governing the conduct of autopsies and
the disclosure of autopsy reports by the office of the chief medical examiner
(OCME), and the exemption from liability of the OCME and its employees
for the lawful disclosure of an autopsy report. [96-97]
A Superior Court judge properly dismissed a civil action filed under the Mas-
sachusetts Tort Claims Act, seeking damages for the alleged negligence of
the office of the chief medical examiner (OCME) and two medical examiners
in failing to notify the plaintiffs, who were the parents of a decedent killed
in the crash of a small airplane, of a correction made to an autopsy report
in response to an inquiry by the plaintiffs, where the plaintiffs' claim was
barred by a provision of G. L. c. 38, § 2, which, read broadly, shields the
OCME and its employees from liability for claims arising from the lawful
disclosure of an autopsy report, including claims that the OCME was
negligent in reaching the findings or conclusions in the report. [97-101]

CIVIL ACTION commenced in the Superior Court Department on
January 22, 2004.

Motions to dismiss were heard by *Robert C. Cosgrove*, J.

After review by the Appeals Court, the Supreme Judicial
Court granted leave to obtain further appellate review.

*David S. Smith* for the plaintiffs.

*Howard R. Meshnick*, Assistant Attorney General, for the
Commonwealth.

GANTS, J. On May 21, 2001, Joseph LeBlanc, Jr. (Joseph, Jr.),
the son of the plaintiffs, Joseph and Marilyn LeBlanc (LeBlancs),
was killed in the crash of a small airplane in Danvers. Also

---

[1]Joseph LeBlanc, Sr.

[2]Abraham Philip. Alexander Chirkov is not a party to this appeal. See note
5, *infra*.

killed in the crash were the pilot (a male) and a female passenger. Because of the severity of the crash, the human remains recovered at the scene were in multiple pieces. Three separate bags of remains that were believed to be those of Joseph, Jr., were received by the office of the chief medical examiner (OCME), and an autopsy of the remains was conducted by two medical examiners, Alexander Chirkov and Abraham Philip, on May 22. On May 26, the remains identified as those of Joseph, Jr., were transferred to a funeral home at the direction of the LeBlancs, and Joseph, Jr., was buried that day. After his burial, the Le-Blancs received a copy of the autopsy report signed by Chirkov and Philip. The report, in the section on external examination, stated that "[t]he penis is present and is uncircumcised." The LeBlancs knew that their son had been circumcised as a child, and reasonably feared that the body delivered to them was not that of their son, but of the pilot, whom they blamed for their son's death.[3]

The LeBlancs' attorney notified the OCME of the LeBlancs' concerns. The LeBlancs allege that, after reviewing the original notes from the autopsy, the OCME learned that the penis had been circumcised, and revised the autopsy report to so state, but did not notify the LeBlancs or their attorney of the revision, or provide them with a copy of the revised report.[4] Because they were not told of the revision, the LeBlancs obtained an order for exhumation from the Essex Division of the Probate and Family Court Department, and on June 26, 2002, exhumed their son's remains and arranged a forensic deoxyribonucleic acid (DNA) examination, which confirmed that the remains were those of their son. The penis among the exhumed remains was also determined to be circumcised.

The LeBlancs filed a negligence action in the Superior Court against the Commonwealth under the Massachusetts Tort Claims Act, G. L. c. 258, § 2, seeking compensation for the cost of the exhumation, the DNA testing, and the forensic examination of the remains, and for their emotional distress.[5]

---

[3]The LeBlancs later learned from the pilot's family that his body had been cremated.

[4]The defendants deny this allegation.

[5]The LeBlancs' initial complaint also included claims alleging reckless infliction of emotional distress. They do not appeal from the dismissal of these claims.

They later obtained leave to amend their complaint to add Chirkov and Philip individually as defendants.[6] On June 30, 2008, the judge allowed the defendants' motions to dismiss all the LeBlancs' claims, and judgment entered for the defendants. The Appeals Court affirmed the judgment of dismissal, with one Justice dissenting. *LeBlanc* v. *Commonwealth*, 75 Mass. App. Ct. 419 (2009). We granted the LeBlancs' application for further appellate review. We affirm the judgment of dismissal.

*Statutory framework.* Under G. L. c. 38, § 2, the chief medical examiner "shall establish a comprehensive system to deliver medicolegal investigative services in the commonwealth," which includes conducting autopsies to investigate and certify the cause of death. See *Macrelli* v. *Children's Hosp.*, 451 Mass. 690, 691 (2008). When notified of a death occurring under one of the circumstances set forth in G. L. c. 38, § 3, including "death by accident," the OCME "shall carefully inquire into the cause and circumstance of the death." G. L. c. 38, § 4. "If, as a result of such inquiry, the chief medical examiner or such designee is of the opinion that the death was due to violence or other unnatural means or to natural causes that require further investigation, he shall take jurisdiction." *Id.* When taking jurisdiction:

> "The medical examiner shall be responsible for making arrangements for transport of the body. The district attorney or his law enforcement representative shall direct and control the investigation of the death and shall coordinate the investigation with the [OCME] and the police department within whose jurisdiction the death occurred. Either the medical examiner or the district attorney in the jurisdiction where death occurred may order an autopsy. Cases requiring autopsy shall be subject to the jurisdiction of the office for such purpose."

*Id.*

Autopsy reports are not "[p]ublic records" subject to disclosure under G. L. c. 4, § 7, Twenty-sixth (*c*). G. L. c. 38, § 2. See *Globe Newspaper Co.* v. *Chief Med. Examiner*, 404 Mass.

---

[6] The LeBlancs waived any challenge to the dismissal of their claims against Alexander Chirkov, but press their appeal as to the dismissal of the negligence claim against Abraham Philip.

132, 136 (1989) (autopsy reports are "medical files or informa-
tion" exempt from public disclosure). "The chief medical
examiner, with approval of the secretary of the executive office
of public safety, shall promulgate rules for the disclosure of
autopsy reports . . . to those who are legally entitled to receive
them." G. L. c. 38, § 2. Under the promulgated regulations,
the OCME is not obligated to provide a copy of the autopsy
report of a decedent to his surviving spouse or next of kin, but
may do so "in its discretion" if three conditions are met: (1) the
surviving spouse or next of kin makes a written request to the
OCME for a copy; (2) the surviving spouse or next of kin pro-
vides an affidavit verifying the affiant's relationship to the
decedent; and (3) in cases of unnatural or suspicious death where
the district attorney is directing and controlling the investigation
of the death, the district attorney or his representative, in his
discretion, declares in writing that he does not object to the
disclosure of the autopsy report. 505 Code Mass. Regs. § 1.03
(2005).

When the chief medical examiner or any employee of the
OCME acts in accordance with these regulations in providing an
autopsy report to anyone legally entitled to receive it, he shall not
be subject to "civil or criminal liability for lawfully disclosing an
autopsy report or any part thereof." G. L. c. 38, § 2.

"After investigation or examination by the [OCME], the
body shall be released to the person with the proper legal authority
to receive it, including the surviving spouse, the next of kin, or
any friend of the deceased, who shall have priority in the order
named." G. L. c. 38, § 13.

*Discussion.* On appeal, the LeBlancs concede that the OCME
did not owe them a duty of accuracy in the preparation of the
autopsy report.[7] They also concede that the OCME was not
obligated to provide them with a copy of the autopsy report,
and that the OCME, in the exercise of its discretion, could have
refused to provide a copy even after the LeBlancs met each of
the three prerequisites in the regulation. See G. L. c. 38, § 2;
505 Code Mass. Regs. § 1.03. Their contention is that, once the
OCME elected to provide them with a copy of the autopsy

---

[7]Specifically, the LeBlancs acknowledge that the office of the chief medical
examiner (OCME) had no duty to correctly identify the presence, or lack
thereof, of the foreskin in the autopsy report.

report and learned of their reasonable fear that they had been provided the wrong body, the OCME owed them a duty promptly to inform them of the error in the autopsy report regarding their son's circumcision.

The OCME concedes that the statutory obligation under G. L. c. 38, § 13, to release the decedent's body to the person with the proper legal authority to receive it implies a duty to provide the actual body of the decedent, and not another dead body.[8],[9] It notes that, despite the confusion created by the error in the autopsy report, the OCME in fact fulfilled its duty to release the actual body of Joseph, Jr., to the LeBlancs, who were his next of kin. The OCME argues that having fulfilled its statutory duty, it owed the LeBlancs no duty with respect to the content of the autopsy report.

Stripped to its essence, the LeBlancs' claim rests on the OCME's failure to notify them of the correction of an error in the autopsy report or to provide them with a copy of the corrected report. We conclude that this claim is barred by the statutory provision that shields the OCME and its employees from liability "for lawfully disclosing an autopsy report or any part thereof." G. L. c. 38, § 2.

This exemption from liability reasonably could be interpreted narrowly or broadly. If read narrowly, it merely shields the OCME and its employees from liability against those who claim that the OCME should not have disclosed an autopsy report, even though the disclosure was lawful. If read more broadly, it shields the OCME and its employees from liability for claims that arise from the lawful disclosure of an autopsy report, including claims that the OCME was negligent in reaching the findings or conclusions in the report. We conclude that the broader

---

[8]The OCME made this concession at oral argument.

[9]Consequently, when the LeBlancs learned from the autopsy report that the decedent delivered to them had not been circumcised, they could have filed a civil action under G. L. c. 38, § 13, contending that the OCME committed a breach of its legal duty to provide them with the body of their son. If such a civil suit had been initiated, the error regarding circumcision presumably would have been discovered and made known to the plaintiffs early in the course of discovery. Instead, the LeBlancs chose to cause their attorney to inform the OCME of their concerns regarding the true identity of the body that had been delivered and, hearing nothing from the OCME in reply, obtained a court order to exhume the body and test the DNA of the remains.

interpretation more likely reflects the Legislature's intent in enacting this provision.

Where a death is "due to violence or other unnatural means or to natural causes that require further investigation," and the chief medical examiner takes jurisdiction and orders an autopsy pursuant to G. L. c. 38, § 4, the rights of the surviving spouse and next of kin are subordinated to the "paramount" public interest in obtaining the truth as to the manner and cause of death. *Gahn* v. *Leary*, 318 Mass. 425, 428-429 (1945). If the surviving spouse or next of kin could file a complaint against the OCME concerning the content of an autopsy report, the paramount public interest in obtaining the truth would be compromised by the fear of liability, especially if the truth were to reveal a cause of death that the family is unwilling or unable to accept.

Even if liability were limited to the correction of errors in the autopsy report, the OCME's obligation to discover and report the truth would still be compromised, because family members may demand correction of what they would characterize as errors but what the OCME may see as facts that are difficult for the decedent's family to accept, but that are nonetheless true. When investigative information, such as the cause of death, is critically important to effective law enforcement and the pursuit of justice but painful to hear or difficult to believe for a decedent's grieving family, it is reasonable for the Legislature to conclude that the accuracy and integrity of such investigative information requires that the OCME be shielded from liability arising from claims brought by family members challenging the content of the autopsy report.[10]

Although this limited exemption from liability arises from

_____

[10]The historical context in which this provision was enacted is consistent with our broader interpretation. In June, 1995, the Legislature approved revisions to G. L. c. 38, § 2, including the provision that the OCME is exempt from civil or criminal liability for lawfully disclosing an autopsy report. St. 1995, c. 38, § 56. Yet, in October, 1994, when the Executive Office of Public Safety, which oversees the OCME, recommended that the Legislature make modest changes to G. L. c. 38, § 2, the legislation it proposed did not exempt the OCME from liability for lawfully disclosing an autopsy report. Legislative Recommendations of the Department of State Police, 1995 House No. 212 at 3. The legislative revisions that exempted the OCME from liability were contained in a June, 1995, amendment to an appropriations bill. The amendment came in response to published reports that questioned whether the OCME had

statute, and therefore may vary in other States, it is noteworthy that other State courts have also concluded that an office like that of the OCME owes no duty of care to a decedent's family regarding the content of an autopsy report, even when the failure of the medical examiner's office to exercise appropriate care needlessly compounded the family's tragedy. In *Lauer* v. *City of N.Y.*, 95 N.Y.2d 95 (2000), the medical examiner's autopsy report initially concluded that a child's death was a homicide caused by "blunt injuries" to the child's neck and brain, but two months later the medical examiner determined that the child's death was caused by a ruptured brain aneurysm, contradicting the earlier conclusion. *Id.* at 97-98. The medical examiner, however, failed to correct the autopsy report or death certificate, or notify law enforcement authorities of the change in conclusion for seventeen months. *Id.* at 98. The delay meant that the father remained under criminal investigation for the death of his son during this time period, his marriage was destroyed, and his reputation was damaged. *Id.* The New York Court of Appeals held that the medical examiner's office owed no duty to the plaintiff, and ordered the complaint dismissed. *Id.* at 101, 105. See *Sims-Hearn* v. *Office of the Med. Examiner*, 359 Ill. App. 3d 439 (2005) (medical examiner owes no duty of care to individual citizens in performance of autopsies); *Maiden* v. *Rozwood*, 461 Mich. 109, 132 (1999) ("Nothing in the statutory scheme has created duties to a criminal defendant; instead, the duty is owed to the state").

been pressured to conceal cocaine use as a possible explanation for the death of a Boston Celtics basketball player, who had collapsed and died suddenly nearly two years earlier. See Suggestion of Drug Use Prompts Review of Probe into Lewis' Death, Boston Globe, Mar. 10, 1995, at Metro 1. A national newspaper reported that one of the doctors who acted as a consultant on the autopsy claimed that a lawyer for the basketball player's family had threatened a lawsuit if the autopsy referred to drug use. *Id.* at 2. The Secretary of the Executive Office of Public Safety directed the chief medical examiner to reexamine the autopsy. See Lewis Autopsy Reports Combed, Boston Globe, Mar. 11, 1995, at Metro 1. This reexamination confirmed the OCME's original conclusion that adenovirus had caused the scarring of the basketball player's heart. See Autopsy Probe Rules out Cocaine in Lewis' Death, Boston Globe, Mar. 29, 1995, at Metro 1. There is no legislative history explaining the origin of the amendment, so we cannot be certain that it was in response to the controversy surrounding the basketball player's autopsy, but we presume the Legislature was aware that, without this specific statutory exemption from liability, the OCME could have been subject to suit under G. L. c. 258, § 2, in this and comparable controversies.

Without question, the OCME should have told the LeBlancs that the autopsy report was in error regarding the circumcision as soon as it recognized the error, so that the LeBlancs could have the peace of mind of knowing that the body they had buried was truly their son, and not the pilot. A failure to do so here would have reflected either bureaucratic bungling or callousness that needlessly compounded a tragic loss. "Were the issue solely one of 'humanistic intuition' or 'moral duty,' the result might well be otherwise." *Lauer* v. *City of N.Y., supra* at 103. See *Griswold* v. *Boston & Me. R.R.*, 183 Mass. 434, 437 (1903) (breach of moral duty does not necessarily constitute breach of legal duty). The Legislature, however, is entitled to protect public entities and employees from liability for negligent conduct for reasons of public policy. We recognize that this particular error reasonably caused the LeBlancs to be uncertain whether the body they had buried was their son's, but neither the significance of the error nor its practical consequence creates liability where the Legislature excludes it.

Because we conclude that neither the chief medical examiner nor any employee of the OCME may be liable for any claim arising from the lawful disclosure of an autopsy report, and because the Commonwealth may be liable to the plaintiffs here under G. L. c. 258, § 2, only for the liability of the chief medical examiner and OCME employees, we affirm the dismissal of the plaintiffs' claims against the Commonwealth. We also affirm the dismissal of the plaintiffs' claims against Philip as an individual. Although the second amended complaint alleges that Philip was an independent contractor of the OCME, it also alleges that he was a medical examiner and that he examined the remains of Joseph, Jr., and signed the autopsy report in his capacity as a medical examiner. While G. L. c. 38 does not define the word "employee," we conclude that the Legislature understood that medical examiners would be among those employees protected by the prohibition against liability in § 2. See Rep. A.G., Pub. Doc. No. 12, at 46-47 (1948). See also *Gahn* v. *Leary*, 318 Mass. 425, 429 (1945) (medical examiner considered "public officer[]").

*Conclusion.* We affirm the judgment dismissing the plaintiffs' claims.

*So ordered.*