BAPTISTA vs. BRISTOL COUNTY SHERIFF'S DEPARTMENT, 100 Mass. App. Ct. 841

 
 NATASHA M. BAPTISTA, individually and as personal representative, [Note 1] vs. BRISTOL COUNTY SHERIFF'S DEPARTMENT (and a companion case [Note 2]).

100 Mass. App. Ct. 841
 October 14, 2021 - April 15, 2022

Court Below: Superior Court, Bristol County
Present: Rubin, Neyman, & Englander, JJ.

 

Massachusetts Tort Claims Act. Protective Custody. Municipal Corporations, Liability for tort, Governmental immunity. Governmental Immunity. Negligence, Governmental immunity, Municipality, Jailor, Intoxicated person. County, Liability for tort. Sheriff. Statute, Construction. Practice, Civil, Interlocutory appeal, Summary judgment.

In the circumstances of consolidated tort actions arising from the death of an incapacitated individual who was struck by another while in protective custody under G. L. c. 111B, § 8, the judge did not err in denying the motions of the defendants (a sheriff's department and the city of New Bedford) for summary judgment under the Massachusetts Tort Claims Act, G. L. c. 258, § 10 (b) and (j), where the department was not entitled to discretionary function immunity under § 10 (b), given that the location at which a person may be held in protective custody is prescribed by § 8 and did not include the cell at the county jail in which the individual was placed [849-853]; where the department was not immune from liability under § 10 (j), given that the commingling of arrestees with a vulnerable, civilly detained incapacitated person was the essence of a situation created by the affirmative act of the department [853-857]; and where, although a close call, the evidence suggesting that a city police officer participated, jointly with a correction officer, in the unlawful act of placing the individual in a locked county jail cell with arrestees, an affirmative act that materially contributed to creating the situation that resulted in the harmful consequences to the decedent, was enough to preclude summary judgment for the city [857-859].

There was no merit to the argument by a sheriff's department and a city that they were entitled to the immunity provided by G. L. c. 111B, § 13, for individuals who act pursuant to the protective custody statute, G. L. c. 111B, § 8. [859-860]

This court declined to review, under the doctrine of present execution, a trial court judge's ruling at summary judgment on the merits of a claim of negligent infliction of emotional distress. [860]

 Page 842 

CIVIL ACTIONS commenced in the Superior Court Department on July 18, 2016, and April 19, 2019. 

 After consolidation, the cases were heard by Raffi N. Yessayan, J., on motions for summary judgment. 

 Adam Hornstine, Assistant Attorney General, for Bristol County sheriff's department.

Michael J. Grace for the plaintiff.

Stephen Pfaff for city of New Bedford.

 RUBIN, J. These tort actions arise from the death of Egidio Batista, the father of the plaintiff, Natasha Baptista, from injuries he suffered when he was pushed to the ground by Luis Mojica, with whom he had been placed in a holding cell at a county jail. [Note 3] The plaintiff has brought claims against the defendants both as the representative of her father's estate and in her individual capacity. The defendants, the Bristol County sheriff's department (BCSD or department) and the city of New Bedford (city), have filed interlocutory appeals from an order denying their motions for summary judgment in which each argued that it was immune from liability, based primarily upon immunities established in the Massachusetts Tort Claims Act (MTCA), G. L. c. 258, § 10 (b) and (j).

 Although an order denying a dispositive motion brought on the basis of immunity from suit is not a "final order," an order denying a motion for summary judgment on that ground has been held immediately appealable under the doctrine of present execution. See Brum v. Dartmouth, 428 Mass. 684, 687-688 (1999); Walenty v. Mendon, 55 Mass. App. Ct. 914, 914 n.2 (2002). Consequently, we have jurisdiction over these appeals. Although the appeals have not been consolidated, because they arise from the same set of material facts and the issues in the two cases overlap, we decide them together. To the extent our discussion bears only upon one or the other of the two appeals, we will make that clear in the text of our discussion.

 Background. These cases involves the death of an individual who was placed in protective custody under G. L. c. 111B, § 8, which provides for such custody for "incapacitated" persons, with incapacitated defined to mean "the condition of an intoxicated person who, by reason of the consumption of intoxicating liquor is (1) unconscious, (2) in need of medical attention, (3) likely to 

 Page 843 

suffer or cause physical harm or damage property, or (4) disorderly." G. L. c. 111B, § 3. In July 2013, at the time of the incident here, § 8 provided as follows:

 "Any person who is incapacitated may be assisted by a police officer with or without his consent to his residence, to a facility or to a police station.

 ". . .

 "If any incapacitated person is assisted to a police station, the officer in charge or his designee shall notify forthwith the nearest facility that the person is being held in protective custody. If suitable treatment services are available at a facility, the department shall thereupon arrange for the transportation of the person to the facility in accordance with the provisions of section seven.

 "No person assisted to a police station pursuant to this section shall be held in protective custody against his will; provided, however, that if suitable treatment at a facility is not available, an incapacitated person may be held in protective custody at a police station until he is no longer incapacitated or for a period of not longer than twelve hours, whichever is shorter.

 ". . .

 "A person assisted to a facility or held in protective custody by the police pursuant to the provisions of this section, shall not be considered to have been arrested or to have been charged with any crime."

G. L. c. 111B, § 8, as amended through St. 1979, c. 597, § 1. [Note 4] "Facility" is defined to mean "any public or private place, or portion thereof, providing services especially designed for the detoxification of intoxicated persons or alcoholics." G. L. c. 111B, § 3.

 The primary question before us is whether this action is permitted by the MTCA. The MTCA provides that public employers, including the defendants here, "shall be liable for injury or loss of property or personal injury or death . . . in the same manner and to the same extent as a private individual under like 

 Page 844 

circumstances." G. L. c. 258, § 2. The statute, however, contains several exceptions to that general rule for particular claims that may be brought against a public employer. Two of those exceptions are at issue in these cases, G. L. c. 258, § 10 (b), which excludes liability for "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused," and G. L. c. 258, § 10 (j), which excludes liability for "any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer." [Note 5]

 A judge of the Superior Court denied the defendants' motions for summary judgment. In reviewing those denials, we must view the evidence in the summary judgment record and all the reasonable inferences that can be drawn therefrom, in the light most favorable to the nonmoving party, here, in both cases, the plaintiff. Juliano v. Simpson, 461 Mass. 527, 529-530 (2012). We must determine whether, viewed in that light, the evidence reveals any genuine issues of material fact, and if not, whether the moving party is entitled to judgment as a matter of law. See Lynch v. Crawford, 483 Mass. 631, 641 (2019). Our review on appeal is de 

 Page 845 

novo. Id.

 Facts. The facts, as described in the parties' joint statement of material facts and drawn from the rest of the record, viewed in the light described above, are as follows. On July 20, 2013, Egidio Batista became intoxicated as a result of alcohol consumption. He returned home to the multifamily building where his daughter and her young children also lived. When he arrived home, he was a drunken nuisance. He banged on the door of the plaintiff's apartment and screamed at her. The plaintiff did not want to subject her family to his drunken behavior and called the New Bedford police department.

 New Bedford police Officer Matthew Rodrigues arrived at the residence at approximately 4:49 p.m. He observed Batista sitting on the first-floor landing outside his apartment door. Batista was sweating, his pants were down, and they were wet, leading Rodrigues to believe Batista had urinated on himself. Rodrigues concluded that Batista was "heavily intoxicated," "more than intoxicated." Concerned that Batista could injure himself if left alone, Rodrigues took Batista into protective custody. See G. L. c. 111B, § 8.

 Rodrigues took Batista to the New Bedford police station, where he was booked but not arrested. Rodrigues then transported Batista to the Ash Street Jail and Regional Lockup (jail), a county jail in New Bedford operated and run by the defendant BCSD and its sheriff, Thomas M. Hodgson. He did so pursuant to a "Memorandum of Agreement for Lockup Facility at Bristol County Ash Street Jail, Massachusetts" (agreement) between the sheriff and the city. [Note 6]

 Page 846 

 Another document, the "BCSD Regional Lock-Up Policy" (lock-up policy), which was applicable to the jail, provided that every prisoner or detainee at the jail must be booked before being put in the regional lockup. The jail had two temporary holding cells where prisoners could be held prior to being booked and taken to the regional lockup. The cells were accessed by clear glass doors off a holding area; the regional lock-up was another part of the facility that was reached through a separate door from the holding area.

 The lock-up policy provided that "protective custody detainees shall be admitted, searched and booked into the Regional Lockup as any other individual and in accordance with the procedures detailed within this policy." It further provided that "[t]ypically, during the booking process, intoxicated and/or violent prisoners or detainees shall be segregated from others and placed in a separate temporary holding cell[]." It provided that "[t]he number of prisoners/detainees entering the temporary holding cells area shall be controlled at all times. Males and females shall always be placed in separate temporary holding cells." The lock-up policy required that "[a] prisoner/detainee shall only be held within a holding cell for longer than [thirty] minutes upon the authorization of the on-duty Watch Commander." It also provided that "[o]nce [the search and booking] process is completed, the Booking Officer or Watch Commander shall ensure that the individual is placed in a separate cell within the Regional Lockup. Under no circumstances shall a violent, intoxicated or otherwise self-destructive prisoner or detainee be placed into a Regional Lockup cell that is occupied by another person." "Cells within the regional lockup" referred to cells to which detainees were transferred after booking, not the holding cells.

 When Batista was brought into the jail, there was a female in one of the holding cells. The other cell was occupied by four male

 Page 847 

 prisoners, including Luis Mojica. All had been arrested by the New Bedford police earlier in the afternoon, Mojica for assault and battery on a household member. Mojica had been in the holding cell for over three hours.

 Batista was extremely intoxicated. According to Correction Officer Ronald Deschenes, Batista was "obviously drunk" when brought in to the jail, although no one tested his blood alcohol level at that time. And indeed, later that evening, at least two hours after he was taken into protective custody, his blood alcohol concentration was recorded at .304, nearly four times the legal limit for operating a motor vehicle.

 The parties' statement of material facts states that upon arrival at the jail, Rodrigues walked Batista to the admissions area and handed his report to a correction officer. [Note 7] It is undisputed that Rodrigues left the jail once the correction officer had signed off on the paperwork and once Batista was placed into the custody and care of the BCSD. Although the joint statement of material facts provides no further detail about what transpired at the jail prior to Rodrigues's departure, there is a video recording (video), without audio, from a security camera in the holding area of the jail that is in the record and that was relied on by the motion judge. The holding area is a large room in the center of which is a body orifice security scanner (BOSS) chair. Both holding cells extend off this holding area. The doors to the holding cells are glass, and one can see clearly into the cells from this area. 

 The video shows that Deschenes entered the holding area first. He was carrying some paperwork and was followed close behind by Batista, who was handcuffed. Rodrigues was behind Batista. Rodrigues remained in the doorway while Deschenes pat frisked Batista. When Deschenes then moved Batista out of the doorway, Rodrigues entered this holding area. He watched while Deschenes began trying to unlock Batista's handcuffs, and he then appeared to hand Deschenes his key. Deschenes unlocked the handcuffs and gave them to Rodrigues. Rodrigues did not, however, leave the room. Deschenes seated Batista in the BOSS chair. The video at least raises a genuine issue of fact whether both Deschenes and Rodrigues gave Batista directions. Rodrigues moved further into the room, and he watched as Deschenes did a final search of Batista with a handheld magnetometer. Because of the glass door

 Page 848 

 and windows into the holding cell, Rodrigues could see that there were already several men in the cell. As Deschenes opened the holding cell door, Batista walked toward Rodrigues, who appeared to redirect Batista back to Deschenes at the door of the holding cell. Deschenes then put Batista in the cell. Although Rodrigues did not physically place Batista in the holding cell, having viewed the video, we think that in the light most favorable to the plaintiff, a fact finder could conclude that Rodrigues assisted Deschenes with his task of placing Batista into the holding cell. [Note 8]

 The evidence shows that Batista tried to resist being placed in the cell, "kind of . . . yelling" at Deschenes, questioning why he was being put in the cell and expressing that he did not want to be put in there. According to Logan Collins, one of the men who was already in the holding cell, Batista was "drunk," "amped up," "really loud," and yelling and swearing. Another individual in the cell, Marcos Teless, described Batista as "all drunk" and "completely drunk," and he said that Batista "didn't know what he was doing," that it "didn't matter what you said to him," that "he wasn't even listening," and that he was "completely out of it."

 After Batista was placed in the cell, he approached his cellmate Mojica, "got into [his] face," and inadvertently stepped on his foot. Mojica forcefully shoved Batista, who fell backward, hitting his head on the cell floor. He started bleeding heavily.

 Deschenes and Correction Officer Goncalves, as well as BCSD Captain Paul Almeida, arrived on the scene. Deschenes and Goncalves pulled Batista out of the cell and placed him on the BOSS chair. Almeida screamed, "[W]ho put him in there?" and asked what had happened. When the BCSD called for an ambulance for Batista, however, they reported to emergency medical personnel that Batista had simply "passed out [and] struck his head." Batista was conscious after the assault and was transported by emergency medical personnel from the jail to St. Luke's Hospital, where he was diagnosed with a large right occipital hematoma and a large subdural hematoma.

 An emergency craniotomy performed that night removed large blood clots from Batista's brain, but he nonetheless died early the next morning. The cause of death was reported as "brain contusions with skull fracture and subarachnoid and subdural hemorrhage

 Page 849 

 due to blunt head trauma," and the manner of death was ruled "homicide."

 No one from the city or the BCSD notified the plaintiff of her father's injury on July 20, 2013, or his death on July 21. She learned of it only when she was informed by her aunt, who worked at St. Luke's Hospital, that her father had been admitted to the hospital from the jail under the name John Doe.

 Discussion. Through her complaints filed in the Superior Court, the plaintiff, as the personal representative of the estate of Batista, has brought negligence claims against the department and the city for wrongful death pursuant to the MTCA, G. L. c. 258, and G. L. c. 229, § 2, and for Batista's own conscious pain and suffering under G. L. c. 229, § 6. In her individual capacity, the plaintiff has brought claims for negligent infliction of emotional distress against the department and the city. Both defendants argue they are entitled to summary judgment because they are immune from liability under G. L. c. 258, § 10, and G. L. c. 111B, § 13. We address these provisions in turn.

 1. General Laws c. 258, § 10. a. Section 10 (b) immunity. The department's first argument is that it is entitled to discretionary function immunity under G. L. c. 258, § 10 (b). The city does not claim immunity under that subsection.

 Section 10 (b) excludes liability for "any claim based upon the exercise or performance or the failure to exercise or perform a discretionary function or duty on the part of a public employer or public employee, acting within the scope of his office or employment, whether or not the discretion involved is abused." As the Supreme Judicial Court has recently explained,

 "The act itself makes no attempt to define what governmental functions are to be deemed discretionary and therefore deserving of immunity. To aid in applying the statute's general language to the countless fact patterns that present themselves, we have developed a two-step analysis. First, the court must decide 'whether the governmental actor had any discretion at all as to what course of conduct to follow.' Harry Stoller & Co. [v. Lowell], 412 Mass. 139, 141 [(1992)]. If the actor's conduct is prescribed by statute, regulation, or other readily ascertainable standard, the government has no discretion, and the exception does not apply. Id. If the first step does not resolve the issue, '[t]he second and far more difficult step is to determine whether the discretion that the

 Page 850 

 actor had is that kind of discretion for which § 10 (b) provides immunity from liability.' Id. Although almost every act involves some degree of discretion, '[t]he discretionary function exception is narrow, "providing immunity only for discretionary conduct that involves policy making or planning."' Greenwood v. Easton, 444 Mass. 467, 470 (2005), quoting Harry Stoller & Co., supra. Discretionary acts do not include those that involve only the 'carrying out of previously established policies or plans.' Barnett v. Lynn, 433 Mass. 662, 664 (2001), quoting Whitney [v. Worcester], 373 Mass. 208, 218 [(1977)]."

Magliacane v. Gardner, 483 Mass. 842, 860 (2020). The department argues that G. L. c. 111B, § 8, and its own policies, provide the jail and its employees with discretion to decide where and with whom to place a detainee held in protective custody under § 8, as Batista was, and that the exercise of that discretion to place Batista in the holding cell with the criminal arrestees, including Mojica, "implicate[d] policymaking" such that it may not form the basis for imposing tort liability on the department.

 We think this argument founders on the first step of the required analysis. The statute that mandates the treatment of public inebriation as noncriminal makes clear where such individuals may be held: "Any person who is incapacitated may be assisted by a police officer with or without his consent to his residence, to a facility or to a police station." G. L. c. 111B, § 8. As the United States Court of Appeals for the First Circuit has explained, 

 "Chapter 111B replaced prior laws which provided for criminal punishment of public inebriants. In place of punishment, Chapter 111B provides for the treatment and rehabilitation of alcoholics and evidences a concern for the health and safety of persons incapacitated by the effects of alcohol. The law accomplishes two objectives. First, Chapter 111B attempts to get intoxicated individuals who engage in disorderly conduct off the streets, protecting the public until they sober up -- a goal previously accomplished by criminal statutes. Second, Chapter 111B looks out for the health and safety of those individuals, attempting to protect incapacitated persons from themselves. Despite its non-penal objectives, the effect of Chapter 111B is, nevertheless, to deprive the allegedly incapacitated person of his or her liberty, by permitting detention at a police station." (Footnotes omitted.)

 Page 851 

Veiga v. McGee, 26 F.3d 1206, 1211-1212 (1st Cir. 1994).

 General Laws c. 111B, § 8, does not permit holding a person in protective custody in a cell in a county jail, and the defendants were without discretion to place the defendant anywhere except those places authorized by statute. As the Supreme Judicial Court has explained, "[I]f the governmental actor had no discretion because a course of action was prescribed by a statute, regulation, or established agency practice, [the] discretionary function exception to governmental liability has no role to play in deciding the case." Greenwood, 444 Mass. at 469, quoting Harry Stoller & Co., 412 Mass. at 141.

 In its primary brief, the department argues that the term police station "includes jails like the Ash Street Jail run by the county sheriffs." It asserts that "the law is most commonly used 'to deprive the allegedly incapacitated person of his or her liberty, by permitting detention' in some sort of government-run detention facility for twelve hours or until the person sobers up. Veiga, 26 F.3d [at] 1212 . . . . [S]ee also Ringuette v. Fall River, 888 F. Supp. 258, 265 (D. Mass. 1995) (noting protective custody detainee held in cell); Lucia v. Peabody, 971 F. Supp. 2d 153, 157 (D. Mass. 2013) (same)." It further argues that the jail "is a police station within the meaning of [c.] 111B because it is a government-run detention facility used to hold someone for twelve hours or until the person sobers up."

 But the plain language of G. L. c. 111B, § 8, is clear. Individuals in protective custody may be held in police stations, not in any other "government-run detention facility." A county jail is not a police station. Moreover, the statute is specific in terms of places where detention is appropriate, and that specificity forecloses an argument that the jail also can somehow qualify. Nor does the case from which the department provides its truncated quotation say that detention is permitted in "some sort of government-run detention facility." It says the statute "permit[s] detention at a police station." Veiga, 26 F.3d at 1212. And in both Ringuette, 888 F. Supp. at 261, and Lucia, 971 F. Supp. 2d at 157, also cited by the department, the individual in protective custody was held, as authorized by statute, in a police station. The department may be correct that its "Ash Street facility . . . [has been] act[ing] as an extension of the New Bedford Police Department's facilities." But it remains a jail and not a police station.

 This plain-language reading of the statute is supported by the scheme it enacts and the purpose of the statute. General Laws 

 Page 852 

c. 111B, § 8, provides for "noncriminal detention" of those incapacitated by alcohol. Lunn v. Commonwealth, 477 Mass. 517, 532 (2017). It allows them to be brought to a police station in order that they may then be transferred to a detoxification facility to receive treatment services. If, but only if, "suitable treatment services" are not available at the nearest facility, an incapacitated person may remain in custody at the police station, but only "until [they are] no longer incapacitated or for a period of not longer than twelve hours, whichever is shorter." G. L. c. 111B, § 8. In light of the way in which the statutory scheme was intended to function, then, it makes sense that it does not authorize detention at jails, prisons, or other government-run detention facilities.

 Indeed it is clear that the Legislature itself understands the words "police station" to mean what they say. It recently amended the statute to add "the Dukes county sheriff's office" to the list of places to which one in protective custody may be taken. See G. L. c. 111B, § 8, as amended through St. 2020, c. 253, § 87 ("Any person who is incapacitated may be assisted by a police officer with or without his consent to his residence, to a facility or to a police station or the Dukes county sheriff's office"). If the Legislature had intended to allow incapacitated individuals to be held in other county facilities, including county jails, or, indeed, in any other government-run detention facilities, it could have said so.

 We recognize that the city has entered into the agreement with the department with respect to detaining incapacitated individuals in protective custody. But if the city believes the approach taken by the statute should be altered and it should be allowed to use the county jail to house incapacitated individuals held in protective custody, it must obtain authorization from the Legislature.

 In its reply brief, and at oral argument, the department argued that the jail was not only a police station, but also that "the Ash Street Jail fits within the definition" of a "facility," as that term is used G. L. c. 111B. The jail, however, is no more a "facility" than it is a police station.

 "Facility" is defined by the statute to mean "any public or private place, or portion thereof, providing services especially designed for the detoxification of intoxicated persons or alcoholics," G. L. c. 111B, § 3, and the statute makes clear that "no department, agency or institution of the commonwealth or any political subdivision thereof shall operate a facility without approval from the department [of public health] pursuant to" G. L. 

 Page 853 

c. 111B, § 6. G. L. c. 111B, § 6. See Cape Cod Times v. Sheriff of Barnstable County, 443 Mass. 587, 591 (2005) (county is political subdivision of Commonwealth). There is no indication that the jail or any portion thereof provided services especially designed for the detoxification of intoxicated persons or alcoholics; as the sheriff explained in his deposition testimony, those in protective custody were simply held there until they "sobered up." [Note 9] Nor is there any indication that the jail has been approved by the Department of Public Health to provide such services. It therefore is not and cannot be a facility within the meaning of the statute.

 Discretionary function immunity therefore is not available to the department because the location at which an incapacitated individual in protective custody may be held "is prescribed by statute," and does not include the cell at the county jail in which he was placed. Magliacane, 483 Mass. at 860. Because G. L. c. 111B, § 8, required that Batista be returned to his residence, taken to a facility, or detained at a police station, the department is not entitled to discretionary function immunity under G. L. c. 258, § 10 (b), for its actions in placing him in the holding cell at the jail.

 b. Section l0(j) immunity. The department and the city each argue that it is immune from liability under G. L. c. 258, § l0 (j). That subsection provides that a public employer shall not be liable with respect to 

 "any claim based on an act or failure to act to prevent or diminish the harmful consequences of a condition or situation, including the violent or tortious conduct of a third person, which is not originally caused by the public employer or any other person acting on behalf of the public employer." 

We turn first to the department.

 i. The department. In Brum, 428 Mass. at 692, 696, the Supreme Judicial Court discussed the language of G. L. c. 258, § 10 (j), at length, in the context of a claim that a school was responsible for

 Page 854 

 an attack on one of its students, perpetrated by persons from outside the school, because the school had failed to provide adequate security. The court held that § 10 (j) immunity did apply. Id. at 696. In so holding, however, the court noted that the language of § 10 (j) presents something of a conundrum: while the "principal purpose" of § 10 (j) is to confer immunity on public employers for harms that "result [from] their 'failure . . . to prevent' the 'violent or tortious conduct of a third person,'" public employers nevertheless can be liable for third-party tortious conduct if the "'harmful consequences' were 'originally caused by the public employer.'" Id. at 692. And the Supreme Judicial Court went on to further define the concept of original cause -- it means "an affirmative act (not a failure to act) by a public employer that creates the 'condition or situation' that results in harm inflicted by a third party" (citation omitted). Kent v. Commonwealth, 437 Mass. 312, 318 (2002). [Note 10] The plaintiff's contention here is that the defendants are not entitled to immunity because their acts originally caused the situation that resulted in Batista's death.

 Under Brum and its progeny, there are two parts to the "original cause" test where harm is inflicted by a third party. First, there must be "an affirmative action; a failure to act will not suffice." Cormier v. Lynn, 479 Mass. 35, 40 (2018). See id. at 41-42 (failure to protect injured student from classmate who pushed him down stairs, and failure to keep student and classmate apart, not actionable because they were failures to act); Stahr v. Lincoln Sudbury Regional High Sch. Dist., 93 Mass. App. Ct. 243, 247 & n.7 (2018) (high school coaches' "failure to properly instruct and supervise" varsity field hockey players participating in drill in which student athlete was injured when struck by field hockey stick wielded by another could not form basis for liability because "the original cause of [the student]'s injury was an omission -- the coaches' failure to properly instruct and supervise the athletes participating in the drill, and thereby ensure [the student]'s safety").

 Second, "[i]n order for a public employer's affirmative act to be the 'original cause' of a 'condition or situation' that results in

 Page 855 

 harmful consequences to another from 'the violent or tortious conduct of a third person,' . . . the act must have materially contributed to creating the specific 'condition or situation' that resulted in the harm." Kent, 437 Mass. at 319. As the Supreme Judicial Court has explained, it adopted this test in order to avoid "an interpretation of the statute that construes the words 'originally caused' so broadly as to encompass the remotest causation and preclude immunity in nearly all circumstances." Id., quoting Brum, 428 Mass. at 695.

 Thus, for example, under G. L. c. 258, § 10 (j), the Commonwealth could not be held liable for a parole officer's negligent failure to supervise a parolee who committed a sexual assault in the trailer park where he was employed as a maintenance man. See Bonnie W. v. Commonwealth, 419 Mass. 122, 126 (1994). But it could be held liable for that parole officer's affirmative act in "contribut[ing] to the plaintiff's injury by negligently recommending [the parolee's] continued employment at the trailer park and misrepresenting [his] criminal history to park management." Id.

 Of course, not every affirmative act that is a but-for cause of injury will be held to have "materially contributed" to creating the specific condition or situation that resulted in the harm. Thus, in Cormier, 479 Mass. at 41, which involved a student injured when a classmate who had been bullying him pushed him down the stairs, the Supreme Judicial Court held that the affirmative acts of requiring the two students to go to school and of putting them in the same class "contributed indirectly" to the injury but were "too remote as a matter of law" to be deemed to have originally caused it (citation omitted). Likewise, in Klevan v. Newton, 97 Mass. App. Ct. 87, 94-95 (2020), we held that a city's action in building its sewer system was too remote to have "originally caused" a particular backup in which sewage flowed into the plaintiff's basement causing property damage. As we explained, "[i]n most suits against a public entity, if one were to retreat far enough from the actual harm one could identify an 'affirmative' government act that could be claimed to be part of the chain of causation and thus an 'original cause.' . . . But § 10 (j)'s language requires a more rigorous causation analysis, focused on the cause of the actual harmful 'condition' that is alleged." Id. Beyond this, we have also held that the "material contribution" test incorporates a test of foreseeability: "[F]or harm to be actionable, it must, as in any consideration of causation

 Page 856 

 in a tort case, have been a foreseeable result of the negligence." Parker v. Chief Justice for Admin. & Mgt. of the Trial Court, 67 Mass. App. Ct. 174, 179 (2006).

 Here, the actual harmful condition that is alleged is the placement of Batista, the extremely intoxicated detainee held in protective custody, in the cell at the jail with arrestees. The decedent was placed in that cell by Deschenes, who was employed by the department.

 This case is thus very much like Devlin v. Commonwealth, 83 Mass. App. Ct. 530, 532-533 (2013), where the plaintiff was civilly committed to Bridgewater State Hospital under G. L. c. 123, § 35, and the Commonwealth allowed criminal convicts to work in the locked area in which the plaintiff was housed -- something we found prohibited by statute and so not within the discretionary function exception in G. L. c. 258, § 10 (b). In Devlin we concluded that the affirmative act of placing a criminal convict in that area, who struck the plaintiff in the side of his face without warning or provocation, "'materially contributed to creating the specific "condition or situation" that resulted in the harm' to the plaintiff." Id. at 535, quoting Harrison v. Mattapoisett, 78 Mass. App. Ct. 367, 371 (2010). We concluded that this was not "a mere failure to act by the Commonwealth" and that the Commonwealth's act was "not so remote from the injury" that it could not be considered to have materially contributed to creating the condition that resulted in the harm, so that the Commonwealth's affirmative act "originally caused" the harm within the meaning of the statute. Devlin, supra.

 Here, the same can be said about the department's unlawful act of placing Batista in the locked cell at the county jail with arrestees, including Mojica. It was an affirmative act that materially contributed to creating the condition or situation that resulted in harmful consequences to Batista from the violent or tortious conduct of Mojica. Consequently, the department is not immune under G. L. c. 258, § 10 (j). [Note 11]

 The department argues that this case is more like Jane J. v. Commonwealth, 91 Mass. App. Ct. 325, 331-332 (2017), where we 

 Page 857 

concluded that G. L. c. 258, § 10 (j), barred holding the Commonwealth liable for a rape committed in a common recreation room in a locked ward at Tewksbury State Hospital, access to which was permitted to both male and female detainees. But as we explained there, the Commonwealth's affirmative act of "merely allowing both men and women access to a common recreation room" was not "an original cause of the plaintiff's rape" because 

"[t]he hospital made a reasoned decision, which is not at issue here, that the male patient posed no risk of sexual assault . . . and nothing in the summary judgment record supports an inference that the recreation room itself made the occurrence of a rape more foreseeable. Under these circumstances, the plaintiff's claim 'can be characterized only as failure to prevent the assailant from being in a position to attack the plaintiff,' which is insufficient to overcome the immunity that § 10 (j) provides." (Footnotes and citation omitted.) 

Jane J., supra at 330-331. Indeed, in Jane J. we distinguished Devlin with respect to foreseeability on the basis of "the management choice . . . to comingle a dangerous prison population with a civilly-committed vulnerable population," noting that the act in Devlin was "explicitly forbidden by statute," and that in Jane J., "the hospital . . . did not comingle two distinctly different committed populations." Id. at 332.

 Of course here, the comingling of arrestees with a vulnerable, civilly detained incapacitated person is the essence of the situation created by the affirmative act of the department. In fact, on the facts of this case, as in Jane J., it is not immaterial to our assessment of foreseeability that Deschenes's placement of Batista, a civil detainee, in a jail cell, was an unlawful act where the law prohibiting it was passed precisely because this type of harm was foreseeable. See Jane J., 91 Mass. App. Ct. at 331. [Note 12]

 ii. The city. The city's argument for immunity presents a closer call. The city emphasizes the statement of material facts, asserting

 Page 858 

 that "the uncontested facts show Rodrigues did not place Mr. Batista into the cell." According to the city, "Rodrigues walked Mr. Batista to the admissions area, handed his report to a correction officer, and left the Ash Street Jail once the paperwork was signed off by the correction officer and Mr. Batista was placed into the custody and care of the Bristol County Sheriff's Department." The city says "there [is] no dispute over the fact that Rodrigues left the Ash Street Jail after Mr. Batista was in the care, custody and control of the BCSD."

 It may be that if Rodrigues had simply turned over Batista to a correction officer at the jail and not gone into the room while Batista was placed in the cell, we would conclude as a matter of law that Rodrigues's actions did not originally cause the condition or situation that led to Batista's injury or death. Here, however, the video evidence shows that Rodrigues was present when Batista was placed in the cell. Moreover, the video raises a genuine issue of fact whether Rodrigues participated, jointly with Deschenes, in the unlawful act of placing Batista in the locked county jail cell with arrestees including Mojica, the affirmative act that materially contributed to creating the condition or situation that resulted in the harmful consequences to Batista. That is enough to preclude summary judgment here. See Lynch, 483 Mass. at 644 (genuine issue of material fact will prevent allowance of motion for summary judgment on ground of immunity from suit).

 Recognizing that we might view the record in this way, the city argues in the alternative that it must be immune under G. L. c. 258E, § l0 (j), in any event because Rodrigues's actions in assisting Deschenes took place after the city had as a matter of law transferred care, custody, and control of Batista to the department, at which point the city no longer had a duty of reasonable care. As the city puts it, "[w]ith a duty of reasonable care no longer owed Mr. Batista by Rodrigues after the BCSD officer accepted care, custody and control of Mr. Batista, the issues of whether or not Rodrigues saw other detainees in the holding cell and/or placed Mr. Batista in the cell is therefore immaterial, as Mr. Batista was now in the BCSD' s protective custody."

 Even assuming the city were correct about the duty of reasonable care, something we do not decide, this argument confuses 

 Page 859 

liability for the underlying tort with the question of immunity. [Note 13] The principles of law that may control the underlying tort claim are not the same as the principles that control the question of G. L. c. 258E, § 10 (j), immunity. Perhaps the city may be found not to be liable in tort, whether because it had no duty of care or for some other reason. But that does not mean that its employee's act -- arguably, jointly acting to put Batista in the holding cell at the jail -- did not originally cause the condition or situation that subsequently developed, the consequence of which was harm to and the death of Batista. Because we have concluded that placing Batista in that cell "original[ly] cause[d]" the relevant condition or situation, for § 10 (j) purposes, the city, as the employer of Rodrigues, is not entitled on this record to summary judgment on ground of § 10 (j) immunity. [Note 14]

 2. General Laws c. 111B, § 13. Beyond G. L. c. 258, § 10, the department and the city argue that they cannot be held liable under G. L. c. 111B, § 13, which provides that "[p]olice officers, facility administrators or other persons acting in a reasonable manner and pursuant to the provisions of this chapter shall not be held criminally or civilly liable for such acts." Even leaving to one side the fact that placement of Batista in the jail was not authorized by c. 111B, this provision can be of no assistance to the department or the city. It provides immunity to individuals who act pursuant to the statute, not to their employers. In the absence of a statute "extend[ing] immunity to the employer of a person granted immunity" by statute, the common-law rule that a principal does not obtain the benefit of an agent's immunity 

 Page 860 

applies. See Taplin v. Chatham, 390 Mass. 1, 5 (1983). [Note 15]

 3. Other bases for summary judgment. Finally, the city alone argues that summary judgment should have been granted on the plaintiff's negligent infliction of emotional distress claim on the basis that the city owed her no duty of care and its actions were not the proximate cause of her injury.

 As we described at the outset, this interlocutory appeal is permitted under the doctrine of present execution. "According to the doctrine of present execution . . . an interlocutory order is immediately appealable if it concerns an issue that is collateral to the basic controversy, and the ruling will interfere with rights in a way that cannot be remedied on appeal from the final judgment" (quotations and citations omitted). Shapiro v. Worcester, 464 Mass. 261, 264 (2013). It is a narrow exception to the rule allowing appeals only of final orders, and it applies to denials of dispositive motions on ground of immunity because "[t]he right to immunity from suit would be 'lost forever' if an order denying it were not appealable until the close of litigation" (citation omitted). Blum, 428 Mass. at 688. In Blum, the Supreme Judicial Court concluded that G. L. c. 258, § 10, "confers immunity from suit," and that, consequently, immediate interlocutory appeal of the denial of a motion to dismiss on § 10 ground was permitted under the doctrine of present execution. Id.

 Bases for reversal of an interlocutory order to which the doctrine does not apply, those that are "substantive, not collateral," however, may not be presented in an interlocutory appeal that is before us under the doctrine of present execution. Shapiro, 464 Mass. at 265. The judge's ruling at summary judgment on the merits of the plaintiff's negligent infliction of emotional distress claim is precisely such a substantive issue. It "does not affect the efficacy of the city's appeal at the conclusion of litigation. Thus, the doctrine of present execution is inapplicable, and this issue is not properly before the court." Id.

 Conclusion. For the reasons described, the order denying the motions for summary judgment is affirmed.

 So ordered.

FOOTNOTES
[Note 1] Of the estate of Egidio M. Batista. 

[Note 2] Natasha M. Baptista, individually and as personal representative of the estate of Egidio M. Batista, vs. City of New Bedford. 

[Note 3] The surnames of plaintiff Baptista and her father, decedent Batista, are spelled differently. 

[Note 4] Though § 8 was amended in 2020 it retains all the language we construe herein. See St. 2020, c. 253, § 87; infra at (describing the 2020 amendment). 

[Note 5] This latter exclusion contains several explicit exceptions. The subsection providing the exceptions provides in full: 

"This exclusion shall not apply to:

"(1) any claim based upon explicit and specific assurances of safety or assistance, beyond general representations that investigation or assistance will be or has been undertaken, made to the direct victim or a member of his family or household by a public employee, provided that the injury resulted in part from reliance on those assurances. A permit, certificate or report of findings of an investigation or inspection shall not constitute such assurances of safety or assistance; and

"(2) any claim based upon the intervention of a public employee which causes injury to the victim or places the victim in a worse position than he was in before the intervention; and 

"(3) any claim based on negligent maintenance of public property;

"(4) any claim by or on behalf of a patient for negligent medical or other therapeutic treatment received by the patient from a public employee."

[Note 6] The agreement provided in relevant part: 

"(a) The Sheriff agrees to accept, detain and house at the Bristol County Ash Street Facility, New Bedford, Massachusetts any and all persons arrested by the City's Police Department pending appearance before the District Court Department of the Trial Court subject to the exceptions listed below. The Sheriff further agrees to accept, house and detain all persons taken in custody by the City's Police Department pursuant to [G. L.] c. 111B[,] [§] 8[,] subject to the exceptions listed below.

"(b) The parties agree and acknowledge that the Sheriff shall only accept, house and detain adult male and female prisoners and detainees. In any event, the Sheriff shall not accept any juvenile prisoners or detainees.

"(c) The Sheriff reserves the right to reject any prisoner or detainee brought to the lock-up facility at the Bristol County Jail, Ash Street, New Bedford, Massachusetts for reasons of institutional security, prisoner[']s medical condition or the failure of the City's Police Department to complete the booking and interrogation process of the prisoner and/or detainee.

"(d) The Sheriff reserves the right to refuse any and all prisoners or detainees after 6:00 a.m. on those days the courts of the Commonwealth are in session."

 Under the agreement, the city paid the sheriff seventy-five dollars per day for each prisoner or detainee the sheriff housed. The only copy of the agreement with which we have been provided is unsigned and undated. There is no dispute on the record before us, however, that an agreement with these terms was in effect.

[Note 7] The parties disagree whether Rodrigues observed the BCSD officers ask if Batista was suicidal or hurt. Although we view the evidence in the light most favorable to the plaintiff, this dispute is irrelevant to our decision. 

[Note 8] This was the conclusion reached by the motion judge as well, and it formed in part the basis of his decision on summary judgment with respect to the city. 

[Note 9] The department points to statement made by the sheriff in his deposition that the department detoxified seven people on average per day, but the sheriff was clear that he was speaking about a "detoxification program" in Dartmouth for sentenced drug addicts, not services provided at the jail. He noted that "[w]hen you're in a detoxification program, that is very different than somebody simply just trying to get sober from being inebriated." 

[Note 10] "In Brum . . . , 428 Mass. [at] 692, 696 . . . , we grappled with the 'interpretive quagmire' of G. L. c. 258, § 10 (j), concluding that the 'originally caused' language refers to the 'condition or situation' in which the harmful consequences occurred, not to the 'violent or tortious conduct' of the third party who inflicted them." Kent, 437 Mass. at 317 n.8. 

[Note 11] To be clear, we do not hold that only an unlawful act can be an "original cause" under G. L. c. 258, § 10 (j). See, e.g., Bonnie W., 419 Mass. at 122. However, in the context of this case, the statutorily unauthorized placement of Batista in the county jail cell was the affirmative act that we conclude materially contributed to creating the condition or situation that resulted in the harmful consequences to Batista. 

[Note 12] And indeed, in his deposition, the sheriff stated that if an intoxicated person showed signs that "they may be vulnerable or a threat to somebody that's already in the cell, the officers would likely not place that person [in the holding cell] . . . and try to book them first so that they would not have to place them in the cell." He agreed it would be unsafe to house violent, intoxicated, or otherwise self-destructive prisoners or detainees with another person in the cell. Rodrigues also agreed that it was "common sense" that it would not be good judgement to place "an incapacitated person who's not under arrest in a cell with four other people who had been arrested for crimes." 

[Note 13] And, of course, given the fact that holding Batista in a cell at the county jail was not permitted by the statute, the city may, in fact, as the plaintiff argues, have actually committed a breach of its duty of care by taking Batista to the jail, a question on which we again express no opinion. 

[Note 14] In light of our conclusion, we need not address the plaintiff's alternative contention that the city is not entitled to immunity under G. L. c. 258, § 10 (j), because hers is a "claim based upon the intervention of a public employee which causes injury to the victim or places the victim in a worse position than he was in before the intervention." The motion judge held that "based on the record, the city intervened, placing Batista 'in a worse position than he was in before the intervention' when Officer Rodrigues picked up Batista at his home and placed him into protective custody at the Ash Street jail in a holding cell with Mojica." We note that with respect to § 10 (j), we decide only that summary judgment for the city would not have been appropriate. The parties of course remain free in subsequent proceedings in the trial court to litigate on the fully developed factual record whether liability is barred by § 10 (j). 

[Note 15] LeBlanc v. Commonwealth, 457 Mass. 94, 98 (2010), is not to the contrary. There, the court construed statutory language that referred to "the chief medical examiner, [and] any employee of the [office of the chief medical examiner]," to provide immunity to both "the [office of chief medical examiner] and its employees." 

 
 Home/Search 
 Table of Cases by Citation
 Table of Cases by Name 
 

 Commonwealth of Massachusetts. Trial Court Law Libraries. Questions about legal information? Contact Reference Librarians.